JOHN BALAZS, Bar #157287
Attorney At Law
916 2nd Street, Suite F
Sacramento, California 95814
Telephone: (916) 447-9299
John@Balazslaw.com

Attorney for Defendant
EDWARD FUENTES

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-S 07-248-WBS |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Hearing: |
| MARIO DIAZ, et. al., | ) | Date: July 19, 2010 |
| | ) | Time: 10:30 a.m. |
| | ) | Hon. William B. Shubb |
| Defendants. | ) | |
| _____ | ) | |

# DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT MISCONDUCT; MEMORANDUM IN SUPPORT OF MOTION

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ................ 1-2

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

I. INTRODUCTION.......................................................... 3

II. STATEMENT OF FACTS............................................ 4

   A. Federal "Operation Valley Star" Investigation's Use Of CW-1 (March 2006- June 2007)............ ............................ 4

   B. State "Operation Monster" Investigation And Prosecution Of CW-1 (September 2007- May 2008).................................. 6

III. ARGUMENT.................................................................. 9

THE SECOND SUPERSEDING INDICTMENT MUST BE DISMISSED BECAUSE THE GOVERNMENT PERMITTED A NORTENO GANG LEADER AND BELIEVED MURDERER TO REMAIN ON THE STREETS WITH IMPUNITY TO CONTINUE TO COMMIT VIOLENT CRIMES AND DEAL HUGE AMOUNTS OF METHAMPHETAMINE IN ORDER TO OBTAIN THE WIRETAP ORDERS IN THIS CASE

   A. Applicable Law.......................................................... 9

   B. The Government Allowed CW-1 To Continue To Lead The Norteno Gang In Stockton And Commit Various Crimes As Its Commander While Acting As An Informant.................................................................... 9

   C. The Government Knew CW-1 Was Involved In At Least One And Possibly Multiple Murders And Other Violent Crimes And Still Continued to Allow Him To Remain At Large So That They Could Use Him As An Informant.................................................................... 10

      1. Federal Task Force Agents Knew That CW-1 Was Believed To Be Responsible For The Murder of John Escobar On October 15, 2006 And Continued To Use Him As An Informant.... 11

      2. CW-1 May Also Be Involved In The Murder Of 19-year Old Manuel Fajardo On February 4, 2007...................................... 12

      3. CW-1 Ordered Vincent Torres To Be Slashed By Another Inmate At DVI.............................. 12

D. Knowing That CW-1 Was The Leader Of The Large Norteno Gang In The Stockton Area The Government Still Allowed CW-1 To Distribute Large Quantities Of Methamphetamine While An Informant............................. 13

E. By Using CW-1 As An Informant Instead Of Prosecuting Him, The Government Permitted CW-1To Deal More Drugs And Commit More Serious Crimes In The Stockton Area Than The Purported Drug Offenses They Uncovered In This Case Until CW-1 Was Ultimately Arrested By Local Stockton Authorities Almost A Year Later.................. 14

IV. CONCLUSION ............................................................ 16

## TABLE OF AUTHORITIES

*United States v. Barrera-Moreno,* 951 F.2d 1089 (9th Cir. 1991)............ 9

*United States v. Restrepo*, 930 F.2d 705 (9th Cir. 1991)........................ 9

*United States v. Bagnariol*, 665 F.2d 877 (9th Cir. 1981)........................ 9

*United States v. Loma*, 706 F.2d 886 (9th Cir. 1983)................................ 9

1  JOHN BALAZS, Bar #157287
   Attorney At Law
2  916 2nd Street, Suite F
   Sacramento, California 95814
3  Telephone: (916) 447-9299
   John@Balazslaw.com
4
   Attorney for Defendant
5  EDWARD FUENTES

6

7

8           IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12  UNITED STATES OF AMERICA,      )   No. CR-S 07-248-WBS
                                   )
13              Plaintiff,         )
                                   )
14        v.                       )   DEFENDANTS' JOINT MOTION TO
                                   )   DISMISS FOR OUTRAGEOUS
15                                 )   GOVERNMENT MISCONDUCT
                                   )
16  MARIO DIAZ, et. al.,           )   Hearing:
                                   )   Date: July 19, 2010
                                   )   Time: 10:30 a.m.
17              Defendants.        )   Hon. William B. Shubb
    ───────────────────────────    )

18  TO:   BENJAMIN B. WAGNER. , United States Attorney, and JASON HITT and
19        WILLIAM S. WONG, Assistant United States Attorneys:

20        PLEASE TAKE NOTICE that, on July 19, 2010, at 10:30 a.m., in the Courtroom of

21  the Honorable William B. Shubb, U.S. District Judge, defendants Larry Sixto Amaro,

22  Gerardo Lopez Mora, Ernest Paul Killinger, Jason Michael Stewart Hanson, Bismark

23  Martin Ocampo, Benjamin Santos Castro, Marco Anthony Gomez, Edward Fuentes,

24  Richard Mendoza, David Perez Ramirez, Faustino Gonzales, Oscar Campos Padilla,

25  Valdemar Salazar Cambunga, and Gabriel Carracheo, through their respective counsel, will

26  and do move this Court for an order dismissing the Second Superseding Indictment against

27  the above-named defendants for the reasons set forth in the attached Memorandum in

28  support of this motion.  This motion is based on the instant motion, attached Memorandum

1    in support of the motion, the accompanying motion and memorandum to suppress wiretaps

2    in this case, the joint set of exhibits supporting both motions, the record in this case,

3    including the wiretap applications, affidavits, orders, and related documents in E.D. Cal.

4    No. 07-SW-0070 WBS (under seal), and any argument or evidence presented before or at

5    the hearing on this motion.  Because the exhibits supporting this motion and the motion to

6    suppress wiretap-intercepted calls contain the name of the informant, the defense will

7    apply for an order to file the exhibits under seal.

8        Defendants request an evidentiary hearing on this motion and ask that a date for such

9    an evidentiary hearing be set at the July 19, 2010 hearing on this motion.

10        Dated:  May 7, 2010

11                      Respectfully submitted,

13                      /s/ John Balazs
                      JOHN BALAZS

14

15                      Attorneys for Defendant
                      EDWARD FUENTES

JOHN BALAZS, Bar #157287
Attorney At Law
916 2nd Street, Suite F
Sacramento, California 95814
Telephone: (916) 447-9299
John@Balazslaw.com

Attorney for Defendant
EDWARD FUENTES

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-S 07-248-WBS-DAD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT MISCONDUCT |
| MARIO DIAZ, et. al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.  INTRODUCTION

The ends do not always justify the means.

In this case, the government partnered with the leader and "shot caller" of the Nortenos gang in the Stockton area and let him run with impunity, purportedly to infiltrate and prosecute others involved in distributing controlled substances.  While acting as an informant during the investigation of this case, law enforcement agents learned that CW-1[1] was believed to have committed at least one murder and other violent crimes and that he continued to distribute large amounts of methamphetamine in the Stockton area with

---

[1] "CW-1" is the label used in the government's affidavits supporting the wiretap applications in this case. The Defendants are aware of the identity of CW-1.  Exhibits that contain CW-1's true name have been submitted under seal.

3

Nortenos gang members that were not targeted by the government.

Inexplicably, even after learning of his involvement in at least one murder and continued drug dealing while acting as an informant, the U.S. Attorney's Office and federal agents did not shut CW-1 down and pursue prosecution of his criminal activities. Rather, CW-1 was allowed to continue to work as an informant, which provided him protection from law enforcement while he engaged in his criminal activities. Even after the arrests in this case in June 2007, CW-1 was let loose on the streets of Stockton where he continued to commit numerous violent crimes and led the Nortenos in dealing drugs for almost another year until he was ultimately arrested and prosecuted by local law enforcement as a result of their "Operation Monster" investigation targeting CW-1 and his cohorts. This is the rare case where the government's conduct in knowingly permitting its "Monster" informant to continue to direct hits and violent crimes and to distribute drugs throughout Stockton is so repugnant and shocking that it violates fundamental principles of due process. The Court therefore must dismiss the Second Superseding Indictment in this case as a violation of Due Process or, alternatively, under its supervisory powers over the administration of justice.

## II. STATEMENT OF FACTS[2]

A.     Federal "Operation Valley Star" Investigation's Use Of CW-1 (March 2006-June 2007)

On March 19, 2007, FBI agent Scott T. Holladay submitted an affidavit in support of the government's initial application to wiretap a cell phone believed to be used by Mario Diaz. The affidavit states that its "Operation Valley Star" targets the so-called Diaz drug trafficking organization, which purportedly operates under the umbrella of the Nuestra

---

[2] The facts alleged in this motion are supported by the authorities cited herein and/or are facts that the defense are prepared to establish at an evidentiary hearing on this motion.

4

Familia (NF),[3] a California prison gang. *Exhibit A, First Holliday Affidavit*, filed March 19, 2007, at 20. Diaz is described as a "high ranking Nuestra Familia member." *Id.* Agent Holladay is a member of the FBI's Stockton Violent Crime Task Force (hereinafter "Task Force") that had initiated an investigation into the drug trafficking activities of Mario Diaz and the NF. *Id.* at 23. The Task Force includes FBI agents Holladay and John Hayes, and Stockton Police Department officers Cesar Mercado, Paul Gutierrez, and the Department's gang intelligence officer James Ridenour. It also includes CW-1's parole officer Juan Rocha, who supervised CW-1 before his parole terminated in the summer of 2006. The Task Force worked with a number of other local officers and received assistance from the San Joaquin County Metropolitan Narcotics Task Force (METRO) beginning in July 2006.

In its investigation, the FBI Task Force made significant use of a cooperating witness identified in the affidavit only as CW-1. Agent Holladay states that CW-1 is a self-admitted member of NF and claims to be the Commander with direct control over all Nortenos in the Stockton area. *Id.* at 23. This claim was confirmed by multiple sources who all regarded CW-1 as the "highest-ranking" member of the Nortenos and/or NF in Stockton. *Id.* at 24. Task Force members were aware that this meant that CW-1 led more than 1,100 violent Norteno gang members in the Stockton area. The Task Force knew CW-1 had a criminal history involving various crimes of violence and drug related offenses, including willfully discharging a firearm in a negligent manner and being a felon in possession of a firearm. *Id.* at 25. While in the California prison system, CW-1 was validated as a member of Nuestra Raza/Northern Structure in 1998. *Id.* CW-1 admitted to members of the Task Force that he became a member of the Nuestra Familia during his incarceration at Pelican Bay state prison. *Id.* at 24. The affidavit states that CW-1 started to cooperate with the Task Force in approximately March 2006 in order to avoid federal prosecution. *Id.* at 25. The FBI reported paying CW-1 $3,500 for his participation in its investigation. *Id.*

---

[3] By referring to the government's use of the label Nuestra Familia, or NF, the defense does not suggest or concede that the NF exists or that it operates on the streets of California.

According to CW-1, defendant Mario Diaz was his "channel" or superior authority and is one of NF's highest ranking members. *Id.* at 26. CW-1 contacted Diaz and purportedly purchased one-half pound of methamphetamine from one of Diaz's couriers on August 3, 2006. *Id.* at 42-45. CW-1 also reportedly purchased one-half pound of methamphetamine from Diaz on August 16, 2006 at his Geez clothing store in Los Banos, California. *Id.* at 53-54. In the next several months through at least March 2007, CW-1 continued to have contact and make phone calls with Diaz. At the same time, CW-1 also continued his drug dealing and other criminal activities as the leader of the Stockton Nortenos. In three consecutive applications filed March 19, April 10, and April 30, 2007, the government used information obtained from CW-1 and other sources to obtain wiretap authorization orders to intercept Diaz's phones. In all three wiretap applications, the government refers to CW-1 as a "reliable source" and states that he is continuing to be used by the government in its investigation of Diaz and his organization. *See Exhibit A, First Holladay Wiretap Affidavit*, filed 3/19/07, at 25; *Exhibit B, Second Holladay Wiretap Affidavit*, filed 4/10/07, at 36-38; *Exhibit C., Third Holladay Wiretap Affidavit*, filed 4/30/07, at 42. On June 26, 2007, a criminal complaint was filed charging Diaz and a large number of other defendants with a conspiracy to distribute controlled substances. A number of these defendants were also charged with substantive drug offenses. No violent offenses are charged against any of the defendants. After charges were filed and the defendants were arrested, the defense believes CW-1's work as an informant then terminated.

B.   State "Operation Monster" Investigation And Prosecution Of CW-1 (September 2007-May 2008)

Without the protection from law enforcement that his work as an informant brought him, local law enforcement started to target CW-1's activities in the summer of 2007. Beginning no later than September 2007, the California Department of Justice, Bureau of Narcotic Enforcement, Special Investigations Unit, Sacramento Regional Office and the Stockton Police Department initiated an investigation entitled "Operation Monster" into

the criminal activity of CW-1 and some of his Stockton area Norteno associates. *Exhibit D*, 12/18/07, Audra D. Orr, Investigation Report, at 1. California Bureau of Narcotics and Enforcement (BNE) Agent Audra Orr reported that the Norteno street gang in the Stockton area "is involved in the trafficking of multiple pound quantities of methamphetamine in the Stockton area in addition to participating in numerous homicides." *Exhibit D*, at 1. According to gang intelligence officer Ridenour, law enforcement agencies in San Joaquin and Stanislaus counties also reported seeing an "increasing number of gang-related shootings and stabbings committed by Norteno gang members against other Nortenos, as well as their rival Sureno gang members." *Exhibit D*, at 2. Local authorities again described CW-1 as the leader of the Stockton Norteno criminal street gang. *Id.* at 2. The local's "Operation Monster" investigation involved many of the same agents involved in the joint Federal-State Task Force in "Operation Valley Star," including Stockton Police Department Detectives James Ridenour and Cesar Mercado.

As part of its investigation, state agents obtained authorization to intercept phones used by CW-1 and his associates in April and May 2008, and later executed search warrants at nine different residences in Stockton and one in Galt. On May 20, 2008, while executing a search warrant at CW-1's residence, officers found, among other things, a .40 caliber handgun with ammunition, a digital scale with a white crystal like substance on the weighing surface area, over $900 in cash, and evidence of a marijuana grow. *Exhibit E*, Stockton Police Incident Report, No. 08-26209, 5/28/08, at 1-4. Arrest warrants were issued for CW-1 and 11 of his associates in the Stockton area.

In her 180-page affidavit supporting arrest warrants for CW-1 and others dated May 27, 2008, Orr provides probable cause to believe that CW-1 has committed the following offenses: (1) a conspiracy to engage in various criminal firearm offenses, (2) being a prohibited person in possession of a firearm, (3) carrying a concealed weapon and loaded firearm, (4) a conspiracy to possess with intent to distribute cocaine, (5) a conspiracy to commit murder and solicitation to commit the murder of Noe Nunez, (6) a conspiracy to commit assault with a deadly weapon with respect to intended victim Mark Barba, (7) a

conspiracy to commit assault with a deadly weapon with respect to intended victim Robert Anthony Flores, (8) a conspiracy to commit assault with a deadly weapon with respect to intended victim Rene "Ronnie" Sauceda, and (9) a conspiracy to commit assault with a deadly weapon with respect to intended victim Rudy Diaz.

In summarizing the case to the grand jury, Stanislaus County Deputy District Attorney Tori Verber stated that prosecutors obtained wiretaps on CW-1 phones "to go after the Nortenos." *Exhibit F*, Reporter's Transcript (RT) of Grand Jury Proceedings, 6/5/08, at 11. She described CW-1 as the "kingpin, who is the head of the organization." *Id.* at 13. In his testimony before the grand jury, Det. Ridenour explained the evidence shows that CW-1 had the power to determine whether a particular Norteno member was "no good" or was clear. *Exhibit G*, RT of Grand Jury Proceedings, 6/12/08, at 714. CW-1 "was the person who was conspiring to do hits on gang members who were in no good standings." *Id.* He was also "setting up dope deals between gang members" and "having other gang members go to people's houses and get weapons for them or for himself." *Id.* In short, CW-1 "was the head shot caller for the Nortenos in Stockton." *Id.*

On June 13, 2008, CW-1 was indicted in San Joaquin Superior Court on three counts of conspiracy to assault with intent to cause great bodily injury on Rene Ronnie Sauceda, Mark Barba, and Noe Nunez (counts one, two, and three, respectively), conspiracy to sell methamphetamine (count four), being a felon in possession of a firearm and ammunition (counts five and six), street terrorism (count seven), and possession of ammunition (count nine). On January 20, 2009, he pled guilty to counts one, two, four, and seven. CW-1 was sentenced to a total of 10 years in prison for his crimes.

## III.  ARGUMENT

**THE SECOND SUPERSEDING INDICTMENT MUST BE DISMISSED BECAUSE THE GOVERNMENT PERMITTED A NORTENO GANG LEADER AND BELIEVED MURDERER TO REMAIN ON THE STREETS WITH IMPUNITY TO CONTINUE TO COMMIT VIOLENT CRIMES AND DEAL HUGE AMOUNTS OF METHAMPHETAMINE  IN ORDER TO OBTAIN THE WIRETAP ORDERS IN THIS CASE.**

### A.  Applicable Law

A district court may dismiss an indictment on the ground of outrageous government misconduct if the conduct amounts to a due process violation.  *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).   "To violate due process, governmental conduct must be 'so shocking and so outrageous as to violate the universal sense of justice.'"  *Id.* (*quoting United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991); *United States v. Bagnariol*, 665 F.2d 877, 883 (9th Cir. 1981) (per curiam).  Although most often raised in the context of an entrapment defense, even where there is no entrapment a defendant "may still invoke the outrageous government conduct defense if he was subjected to police conduct repugnant to the American system of criminal justice."  *United States v. Lomas*, 706 F.2d 886, 890 (9th Cir. 1983).

Even if government misconduct does not rise to a due process violation, the court may in some circumstances dismiss an indictment under its supervisory powers.  *Barrera-Moreno*, 951 F.2d at 1091.  The court's exercise of its supervisory powers is warranted for three reasons:  "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct."  *Id.*

### B.  The Government Allowed CW-1 To Continue To Lead The Norteno Gang In Stockton And Commit Various Crimes As Its Commander While Acting As An Informant.

While he acted as undercover informant for the government in its Valley Star Investigation, the government knew and permitted CW-1 to continue to act as the leader of the Nortenos gang in the Stockton area.  Authorities first documented the Norteno criminal street gang in the City of Stockton on March 19, 1990.  *Exhibit D*, at 2.  Stockton police

department detective James Ridenour is described in reports as a gang intelligence officer for the Stockton Police Department Gang Violence Suppression Unit, primarily responsible for investigating Hispanic criminal street gangs. Det. Ridenour has participated in hundreds of Hispanic gang investigations and has been recognized as an expert in Hispanic criminal street gangs in San Joaquin County Superior Court. Det. Ridenour estimates that there are approximately 1,180 Norteno gang members and associates in the Stockton area. *Exhibit D*, at 2. Det. Ridenour worked with the FBI Task Force in its Operation Valley Star investigation and its use of CW-1.

As set forth below, CW-1 continued to run the Nortenos during his stint as an Operation Valley Star informant in 2006 and 2007, as well as afterward until he was subjected to local wiretaps on his own phones and prosecuted in Stanislaus County in 2008. As leader and "shot caller" of the Nortenos, CW-1 had direct authority to order other Stockton Nortenos to kill or injure other gang members that were not in its leaders' good graces. Between the Spring of 2006 and Spring of 2008, CW-1 and his associates undoubtedly committed numerous serious, violent crimes and were responsible for massive amounts of drug dealing in the Stockton area–significantly greater crimes than those ultimately prosecuted in this case.

C. <u>The Government Believed CW-1 Was Involved In At Least One And Possibly Multiple Murders And Other Violent Crimes And Still Continued to Allow Him To Remain At Large So That They Could Use Him As An Informant</u>.

Not only did the government use CW-1 as an informant while he was allowed to continue to lead the Nortenos in Stockton, the government also learned that CW-1 was believed to have committed one and possibly more violent crimes under their watch. As set forth in the Statement of Facts, the government used CW-1 as an informant in this case starting no later than March 2006 and continuing through at least May 2007. During this period, local authorities identified CW-1 as the primary suspect in the murder of John Escobar on October 15, 2006. CW-1 is also believed to have been involved in other violent crimes, including the murder of 19-year old Manuel Fajardo on February 4, 2007.

**1.     Federal Task Force Agents Knew That CW-1 Was Believed To Be Responsible For The Murder Of John Escobar On October 15, 2006 And Continued To Use Him As An Informant.**

According to an affidavit by BNE agent Audra Orr dated December 6, 2007 and other records, CW-1 is the primary suspect in the murder of John Escobar on October 15, 2006:

> On October 15, 2006, Stockton Police Officers were dispatched to a shots fired call with a subject down in the 800 block of Morada Lane. When officers arrived on scene, they found the victim, John ESCOBAR on the ground with several gunshot wounds. ESCOBAR died at the scene due to his injuries.
>
> During the investigation, detectives from the Stockton Police Department Homicide Unit questioned numerous subjects about this crime. During their investigation, they learned that [CW-1] and ESCOBAR were involved in an argument earlier in the day at the AM/PM on West Fremont Street. During the argument, [CW-1] pulled out a handgun and threatened ESCOBAR.
>
> After the argument ESCOBAR went back to a party where he told several subjects he was involved in an argument with [CW-1]. ESCOBAR left the party and his whereabouts from then until this incident are unknown.
>
> Detectives brought [CW-1] into their office for an interview. During the interview, [CW-1] denied killing ESCOBAR or knowing anything about this incident. Detectives gave [CW-1] a polygraph examination. On several questions, [CW-1's] answers were inconclusive. The polygraph examiner could not determine if [CW-1] was telling the truth.
>
> As of this date, the homicide is still open and no suspects have been arrested.

*Exhibit H, Audra Orr, Statement of Probable Cause, 12/6/2007*, at 10-11.

Before bringing CW-1 in for an interview, the detectives consulted with Task Force officers FBI agent John Hayes and Cesar Mercado, who advised the detectives that CW-1 was their informant. The detectives then made an appointment to meet CW-1 so that they could administer the polygraph. In other court documents and reports, CW-1 is described as the "primary suspect" in the Escobar murder. *See, e.g. Exhibit D*, at 1. After the Escobar shooting, the FBI Task Force continued to use CW-1 as an informant in this case though officers believed he was responsible for the murder of Escobar. CW-1 has never been charged with the Escobar homicide.

## 2. CW-1 May Also Be Involved In The Murder Of 19-Year Old Manuel Fajardo On February 4, 2007.

While acting as an informant in this case, CW-1 appears to be connected to a second murder with Stockton Norteno gang member Tim Collins. On February 4, 2007, 19-year old Manuel Fajardo was shot and killed at a "sideshow" in Stockton. *Exhibit I.* A "sideshow" is an illegal street party involving dangerous driving stunts, which are often put on by gang members. At the sideshow, Fajardo was shot in the lower back. *Exhibit J*, Stockton Police Incident Report, No. 08-4696, 6/9/2008, at 1. He was taken to San Joaquin General Hospital where he died that same day. *Id.*

At the hospital, a large, rowdy crowd arrived, which is believed to have included CW-1 and Tim Collins. The crowd created a disturbance and would not cooperate with police in its investigation of the shooting. *Id.* An officer noticed that Collins had blood on his hands and clothing. *Id.* Collins refused to talk to officers at the hospital. *Id.* at 2. The defense has also learned through its investigation that, before the shooting, CW-1 had beaten up Fajardo.

Collins is a validated Norteno gang member and close associate of CW-1. Collins has been described to law enforcement as CW-1's bodyguard. Collins was stopped in a car with CW-1 by law enforcement officers on February 6, 2007 and December 2, 2007. *Id.* at 2. Collins was also arrested in May 2008 with CW-1 and a number of other Nortenos as a result of local authorities' "Operation Monster" investigation. In an investigation report dated June 9, 2008, Det. Ridenour notes that Collins agreed to talk to the police about the Fajardo shooting only after an unnamed associate of Collins was arrested. *Exhibit J*, at 2. As the leader and "shot caller" of the Nortenos in Stockton, it is believed that CW-1 ordered the hit on Fajardo that led to his shooting death.

## 3. CW-1 Ordered Vincent Torres To Be Slashed by Another Inmate At DVI.

In September 2006 or thereabouts, Torres was involved in a fight at a public park in Modesto with another Norteno. Afterward, CW-1 asked Torres to meet him at Louis Park in Stockton and Torres agreed to meet CW-1. At the park, CW-1 punched Torres in the

face and knocked him out. When he gained consciousness, CW-1 attempted to go after Torres again with a broken beer bottle and/or a knife, but was restrained from stabbing Torres by others. Task Force members were aware of this incident at the time it occurred. CW-1 was never arrested nor prosecuted for this assault.

By the end of September 2006, Vincent Torres was arrested and incarcerated on the main line at DVI. Thereafter, Torres is slashed by another inmate with a razor blade, who uttered that this is from "Peanut" before he sliced Torres. "Peanut" is the nickname of CW-1. According to a report by Det. Ridenour, an informant stated that the order to slash Torres came from CW-1 because Torres and another Norteno gang member had been in a fight with a high-ranking NF member. *Exhibit K*, Stockton Police Incident Report, No. 08-4696, 2/27/08, at 1. Torres received medical treatment for his injuries. Although the defense is continuing to investigate, defendants believe this slashing incident occurred in January 2007.

D.    <u>Knowing That CW-1 Was The Leader Of The Large Norteno Gang In the Stockton Area, The Government Still Allowed CW-1 To Distribute Large Quantities Of Methamphetamine While An Informant</u>.

As set forth in the government's affidavits in support of its wiretap applications, the government knew that CW-1 was the "Commander" of the Nortenos in the Stockton area with direct authority over their activities. Law enforcement estimates the Nortenos have over 1,100 members in the Stockton area. Throughout the Task Force's Valley Star investigation, CW-1 did not lose his status as the head of the Stockton Nortenos and continued to deal drugs. For example, a BNE report states that an informant told the FBI during its Valley Star investigation that Mark Barba supplied drugs to CW-1. *Exhibit L*, BNE 2/25/08 Investigation Report. During the period CW-1 acted as an informant from approximately March 2006 to June 2007, the government permitted CW-1 to buy and sell drugs outside of its Diaz DTO targets. In 2008, CW-1 turned against Barba and ordered others to "cut him up, or put a hole in him." *Exhibit M*, at 3. Although the Task Force knew that CW-1 continued to be involved in drug trafficking with others not targeted by the Task Force while working as their informant, the Task Force did not terminate his FBI

informant agreement and instead permitted him to continue to run the streets of Stockton.

E.    By Using CW-1 As An Informant Instead Of Prosecuting Him, The Government Permitted CW-1 To Deal More Drugs And Commit More Serious Crimes In The Stockton Area Than The Purported Drug Offenses They Uncovered In This Case Until CW-1 Was Ultimately Arrested By Local Stockton Authorities Almost A Year Later.

After the arrests of the defendants in the instant case in June 2007, CW-1 continued to lead the Nortenos in Stockton and was involved in numerous violent crimes and large scale drug dealing in the Stockton area. With CW-1 on the streets of Stockton, law enforcement agencies in San Joaquin and Stanislaus counties reported seeing "an increasing number of gang-related shootings and stabbings committed by Norteno gang members against other Nortenos, as well as their rival Sureno gang members." *Exhibit D, Orr Investigation Report*, 12/18/07, at 2.

By the time local authorities decided to target CW-1 in September 2007 through "Operation Monster," Det. Ridenour had learned from members of the Central Valley Gang Task Force that CW-1 was receiving money from Norteno gang members in Modesto and Stanislaus County because he was in charge of Norteno operations in that area. Ridenour was told that Norteno gang members were paying CW-1 as their leader approximately $50,000 for their trafficking of controlled substances in the Modesto area. *Exhibit D, Orr Investigation Report*, 12/18/07, at 4. An informant also told law enforcement that CW-1 was the main methamphetamine distributor in Stockton. *Exhibit K*. CW-1 later pled guilty to conspiring to distribute methamphetamine between April 11 and May 5, 2008. That charge of the indictment alleged that CW-1 sold methamphetamine to Randy Monte (three times), Robert Posada, Dennis Mailloux (twice), Vince Young, Manuel Ramirez, and Tim Collins, and that CW-1 purchased methamphetamine from Jose Martinez. *Exhibit M*.

CW-1 also continued to be directly involved in firearm offenses and violent attacks throughout the Stockton area. CW-1 "was identified as a suspect in an assault with a deadly weapon on September 23, 2007," again with his known associate Tim Collins. *Exhibit D, at 2*. As a result of their "Operation Monster" investigation, CW-1 was charged with being a felon in possession of two firearms and ammunition (counts 5, 6 and 9) and the following

three violent crimes in San Joaquin County Superior Court:

**Count 1 (Conspiracy to Assault Rene Ronnie Sauceda With Force likely To Cause Great Bodily Injury (GBI))**

In May 2008, CW-1 discussed with Manuel Ramirez in a wiretap intercepted call that Rene Ronnie Sauceda needed to be assaulted because he was not in good standing with the gang. CW-1 told Ramirez, "I want [Sauceda] to be hurt real bad. I want him to be bashed." CW-1 recruited other gang members for the assault and requested that another gang member obtain a gun for the assault. CW-1 later told Ramirez that the assault on Sauceda should not be "half-stepped." CW-1 was charged with this assault offense with two other Norteno gang members. *Exhibit M*, at 1-2. CW-1 pled guilty to the offense.

**Count 2 (Conspiracy To Assault Mark Barba With Force Likely To Cause GBI)**

In response to purported wrongdoings by Mark Barba, CW-1 orders in a 4/14/08 wiretap intercepted call that Barba be "touched (assaulted)." In later calls, CW-1 directed Ramirez that the assault must be "nothing weak," has to be "extreme," and must include "some bloodshed," and "cut [Barba] up, or put a hole in him." *Exhibit M*, at 3. CW-1 also drove with another Norteno to try to locate Barba. When they learn that he is in custody, CW-1 told Ramirez to order inmates to "smash" and "bash" Barba while he is in custody. *Exhibit M*, at 3-4. CW-1 pled guilty to this offense.

**Count 3 (Conspiracy To Assault Noe Nunez With Force Likely To Commit GBI)**

In connection with the plan to assault Mark Barba, CW-1 and Ramirez agreed to send a message to Barba by assaulting Noe Nunez. On April 14, 2008, CW-1 and two other Nortenos drove to the residence of Nunez and exited their vehicle to identify the residence. This count was dismissed as part of CW-1's plea agreement with local authorities. *Exhibit M*, at 4-5.

Overall, the government knowingly allowed CW-1 to get away with far more serious, violent crimes and drug dealing than all the drug offenses prosecuted in this case. To allow a believed murderer and Norteno regiment leader to continue to commit violent acts and head a large criminal street gang organization for almost two years in order to obtain the

wiretaps in this case is so shocking and outrageous as to violate due process.

## IV. CONCLUSION

For these reasons, the Court must dismiss the Second Superseding Indictment.

Respectfully submitted,

Dated: May 7, 2010

/s/ Peter Kmeto
PETER KMETO
Attorney for Defendant
LARRY SIXTO AMARO

Dated: May 7, 2010

/s/ Hayes H. Gable III
HAYES H. GABLE III
Attorney for Defendant
GERARDO LOPEZ MORA

Dated: May 7, 2010

/s/ Michael Bradley Bigelow
MICHAEL BRADLEY BIGELOW
Attorney for Defendant
ERNEST PAUL KILLINGER

Dated: May 7, 2010

/s/ Scott L. Tedmon
SCOTT L. TEDMON
Attorney for Defendant
JASON MICHAEL STEWART HANSON

Dated: May 7, 2010

/s/ Dwight M. Samuel
DWIGHT M. SAMUEL
Attorney for Defendant
BISMARK MARTIN OCAMPO

Dated: May 7, 2010

/s/ Lindsay Anne Weston
LINDSAY ANNE WESTON
Attorney for Defendant
BENJAMIN SANTOS CASTRO

Dated: May 7, 2010

/s/ Michael Donald Long
MICHAEL DONALD LONG
Attorney for Defendant
MARCO ANTHONY GOMEZ, JR.

Dated: May 7, 2010

/s/ John Balazs
JOHN BALAZS
Attorney for Defendant
EDWARD FUENTES

16

Dated:  May 7, 2010

/s/ Jan David Karowsky
JAN DAVID KAROWSKY
Attorney for Defendant
RICHARD MENDOZA

Dated:  May 7, 2010

/s/ Robert M. Holley
ROBERT M. HOLLEY
Attorney for Defendant
DAVID PEREZ RAMIREZ

Dated:  May 7, 2010

/s/ Eugene Jesus Martinez
EUGENE JESUS MARTINEZ
Attorney for Defendant
FAUSTINO GONAZALES

Dated:  May 7, 2010

/s/ Paul B. Meltzer
PAUL B. MELTZER
Attorney for Defendant
OSCAR CAMPOS PADILLA

Dated:  May 7, 2010

/s/ Candace Anne Fry
CANDACE ANNE FRY
Attorney for Defendant
VALDEMAR SALAZAR CAMBUNGA

Dated:  May 7, 2010

/s/ Joseph J. Wiseman
JOSEPH J. WISEMAN
Attorney for Defendant
GABRIEL CARACHEO