UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,          CR. NO. 2:07-248 WBS

           v.

BENJAMIN SANTOS CASTRO, MARCO    <u>MEMORANDUM AND ORDER RE:</u>
ANTHONY GOMEZ, JR., and         <u>CALCULATION OF SENTENCING</u>
EDWARD FUENTES               <u>GUIDELINES</u>

        Defendants.

_____/

----oo0oo----

        After a coordinated investigation with federal and state law enforcement, the government indicted over twenty-five defendants allegedly involved with a large drug trafficking conspiracy operating under the Nuestra Familia Prison Gang ("Nuestra Familia" or "NF"). Two jury trials have been held, which resulted in guilty verdicts for six of the defendants, and fourteen of the defendants have pled guilty, including defendants Edward Fuentes, Benjamin Santos Castro, and Marco Anthony Gomez, Jr. This Order determines the total offense level and criminal

history category under the United States Sentencing Commission

Guidelines Manual ("Guidelines") for Fuentes, Castro, and Gomez.

See generally United States v. Johnson, 581 F.3d 994, 1001 n.4

(9th Cir. 2009) ("Although merely advisory after United States v.

Booker, 543 U.S. 220 (2005), sentencing courts must consult the

Guidelines as a 'starting point' for the sentencing determination

and the advisory 'range must be calculated correctly.'" (quoting

United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008))).

Fuentes, Castro, and Gomez each pled guilty without a

plea agreement to three counts from the Second Superseding

Indictment, which were for violations of 21 U.S.C. §§ 841(a)(1)

and 846 based on a conspiracy, beginning no later than April 1,

2004 and continuing through June 27, 2004, to distribute and

possess with intent to distribute at least fifty grams of

methamphetamine and at least five grams of cocaine and § 843(b)

based on the illegal use of a communication facility for the

purpose of drug trafficking.  All three defendants[1] objected to

the recommended offense levels in their respective Advisory

Guideline Presentence Investigation Report ("PSR").  To resolve

defendants' objections, the court held a three-day evidentiary

hearing to determine the quantity of drugs attributable to each

defendant and assess their roles in the offenses.

After conducting the evidentiary hearing, the court

received and considered sentencing memoranda from all parties,

which included defendants' numerous objections to the PSRs.  On

---

[1] Reference to "defendants" in this Order refers only to Fuentes, Castro, and Gomez, not all of the defendants in the underlying criminal case.

2

March 26, 2012, the court heard extensive oral arguments relative to the calculations of the Guidelines range for each defendant. The court thereupon took the issue of the Guidelines calculations under submission.

The court's findings and discussion in this Order are limited to calculating the total offense level and criminal history category for each defendant and ruling on their objections to their respective PSRs. In making its findings when there was a dispute, the court only considered the evidence presented at the evidentiary hearing at which the defendants were present and had the opportunity to cross-examine the witnesses. The court did not consider or rely on any evidence from the prior jury trials or statements in the PSR that were not supported by the evidence at the hearing.

I. <u>Credibility of Witnesses at Evidentiary Hearing</u>

Defendant Mario Diaz, Jr., was a high-ranking Nuestra Familia member and a significant leader in the drug trafficking operation underlying the indictments in this case. At the sentencing hearing and jury trials, Diaz testified for the government. The court has thus had the opportunity to observe his demeanor over the course of the hearing and two trials and finds the entirety of his testimony credible. Given the duration of the conspiracy and the detail to which Diaz has described the numerous events that occurred, the court finds it would be nearly impossible for him to fabricate his testimony and remain as consistent as he has throughout the lengthy and repeated direct and cross examinations. While Diaz's criminal conduct would certainly belie any suggestion that he is of good character, it

3

appears that he has made a conscious decision that it is in his own best interest to tell the truth. Having gone as far as he has in betraying the NF, Diaz has nothing to gain by being anything but truthful. While he is obviously hoping he will receive witness protection, he does not appear to be worried about whether his testimony is pleasing the government or court. The court has also never had the impression that Diaz's testimony is influenced by any bias against his co-defendants.

Jorge Sandoval, who is a defendant in a criminal case that has been related to the one at hand, also testified for the government at the evidentiary hearing. Although Sandoval did not recall details of events as well as Diaz, the court also found his testimony credible. As with Diaz, Sandoval appears to have decided it is in his best interest to testify for the government and has nothing to gain by being dishonest. His testimony was consistent with Diaz's testimony and, aside from his convictions, he was not sufficiently impeached to cast doubt on his veracity.

II. <u>Base Offense Level Calculation Based on Drug Quantity</u>

"The base offense level under the Guidelines for a defendant convicted of drug trafficking depends on the quantity of drugs involved in the offense." <u>United States v. Dallman</u>, 533 F.3d 755, 760 (9th Cir. 2008) (citing U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 2D1.1(a)(3)). To determine the quantity of drugs, the Guidelines provide that the court can look to all relevant conduct, which, "in the case of a jointly undertaken criminal activity," includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3. Thus, a "defendant is

4

accountable for all quantities of contraband with which he was directly involved and, in the case of a jointly undertaken activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." United States v. Palafox-Mazon, 198 F.3d 1182, 1186 (9th Cir. 2000) (quoting U.S.S.G. § 1B1.3 cmt. n.2) (internal quotation marks omitted); accord Dallman, 533 F.3d at 760.

"Before a court can hold a defendant accountable at sentencing for the 'relevant conduct' of others, it must 'first determine the scope of the criminal activity the particular defendant agreed to jointly undertake.'" Palafox-Mazon, 198 F.3d at 1186 (quoting U.S.S.G. § 1B1.3 cmt. n.2). The Guidelines define "jointly undertaken criminal activity" as "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3 cmt. n.2. The Guidelines recognize that the scope of a defendant's jointly undertaken criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." Id. The Ninth Circuit has explained that the "court may not rely simply upon the total amount involved in the drug conspiracy, but must undertake an individualized evaluation of the amount for which [the defendant] is accountable under the Guidelines." United States v. Newland, 116 F.3d 400, 405 (9th Cir. 1997).

"The scope of the jointly undertaken criminal activity 'may depend on whether, in the particular circumstances, the

5

nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities.'" <u>Dallman</u>, 533 F.3d at 760 (quoting U.S.S.G. § 1B1.3 cmt. n.2(c)(8)); <u>see also</u> U.S.S.G. § 1B1.3 cmt. n.2 ("In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.").

"After determining the scope of the criminal activity to which a defendant agreed, the court then determines whether the conduct of others was 'in furtherance of the jointly undertaken criminal activity' and 'reasonably foreseeable in connection with that criminal activity.'" <u>Palafox-Mazon</u>, 198 F.3d at 1186 (quoting U.S.S.G. § 1B1.3 cmt. n.2). Generally, "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant's joining the conspiracy is not included as relevant conduct in determining the defendant's offense level)." U.S.S.G. § 1B1.3 cmt. 2.

"Although the guidelines clearly authorize the district court to approximate drug quantities, as with all factors which increase a defendant's offense level, the government is required

6

to prove the approximate quantity by a preponderance of the evidence." United States v. August, 86 F.3d 151, 154 (9th Cir. 1996). "The district court must 'conclude that the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible.'" Id. at 154 (quoting United States v. Walton, 908 F.2d 1289, 1302 (6th Cir. 1990)). "Furthermore, the information which supports an approximation must possess 'sufficient indicia of reliability to support its probable accuracy.'" Id. (quoting U.S.S.G. § 6A1.3(a)). "Additionally, since a defendant's sentence depends in large part upon the amount of drugs attributable to his conduct, and approximation is by definition imprecise, the district court must err on the side of caution in choosing between two equally plausible estimates." Id.; accord Walton, 908 F.2d at 1302 ("[W]hen choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution.").

A.   Scope of Jointly Undertaken Criminal Activity

The drug trafficking conspiracy giving rise to the indictments in this case spanned over numerous cities in Northern California and involved substantial quantities of drugs that would merit application of the highest base offense level for drug quantity (38) if the court attributed all of the drugs in the conspiracy to defendants. Diaz's testimony at the evidentiary hearing revealed, however, that the scope of the criminal activity that Fuentes, Castro, and Gomez agreed to jointly undertake within the trafficking operation did not extend

7

to all of the drugs in the conspiracy. The conspiracy involved multiple levels of command, with Diaz and defendant Larry Sixto Amaro in higher positions, and coconspirators such as Fuentes, Castro, and Gomez operating in a particular region. The individuals operating in each region were referred to as a regiment.

The regiments, such as the San Francisco regiment and Merced regiment, functioned separately from each other and only assumed responsbility for the drugs in their region. Although the regiments may have received better pricing based on the quantity of drugs Diaz purchased in order to supply drugs to all of the regiments, Diaz testified that he set the price of drugs separately for each regiment according to the market in the regiment's territory and did not disclose the price one regiment paid to another regiment. Additionally, while the leader of a regiment, known within the organization as a regiment commander, was responsible to cover losses incurred by a member of his regiment (such as the loss of drugs due to an arrest of a regiment member and seizure of his drugs), the regiment commander was not responsible for and likely not aware of losses incurred by another regiment.

The structure of the drug trafficking organization and the independence of and lack of coordination between the various regiments lead the court to conclude that the drug operations of each regiment were separate criminal activities and that Fuentes, Castro, and Gomez agreed only to jointly undertake the criminal activity conducted by their regiment. As discussed in more detail below, at varying points during the conspiracy, Fuentes

8

was the regiment commander for the Merced regiment and Castro and Gomez were regiment commanders for the San Francisco regiment. Accordingly, in determining the quantity of drugs for which each defendant is accountable, the court will consider only the drugs each defendant was directly involved with and the reasonably foreseeable quantities purchased or sold within the area controlled by each defendant's regiment during the time the defendant was operating in the regiment.

## B. Base Offense Level for Fuentes

In the PSR, the probation officer concludes that the evidence is sufficient to support a base offense level of 38 for Fuentes, but recognizes that "the Court has not yet made a finding as to the amount(s) of drugs attributable to the defendant" and thus the offense level "is subject to change." Fuentes objects to a base offense level of 38 and contends that the appropriate base offense level is 32.

Diaz testified that he first met Fuentes in 2006 when he was a Norteño and, at that time, Fuentes had instructions from an NF member housed in Pelican Bay to establish a regiment in Merced. (Dec. 6, 2011 Tr. ("Dec. 6 Tr.") 45:9-13, 45:23-46:17, 47:16-22.) Diaz explained to Fuentes that anything happening on the streets was under the control of the NF generals in federal custody, which, as the authority ran down the control chain, included Diaz and Amaro. (Id. at 49:8-50:5.) After this discussion, Fuentes "fell in suit," agreeing to be under the authority of the NF generals in federal custody, and thus Diaz. (Id. at 50:18-23.) Diaz determined that Fuentes was the best person to start a regiment in Merced and gave him instructions to

9

"build a regiment and start flowing in with drugs, start bringing in drugs to [Merced]." (<u>Id.</u> at 51:2-10, 52:2-3.) Fuentes was willing to take that responsibility, and Fuentes and Diaz started trafficking drugs together, with Fuentes serving as the regiment commander for Merced. (<u>Id.</u> at 52:9-24.)

At the evidentiary hearing, Diaz estimated that the total amount of methamphetamine he supplied to Merced directly through Fuentes was "more than three pounds." (Dec. 7, 2011 Tr. ("Dec. 7 Tr.") 192:23-193:4.) Intercepted calls between Diaz and Fuentes corroborate this testimony. For example, in an intercepted call on March 28, 2007, Fuentes asked whether a delivery of drugs had come in and Diaz and Fuentes discussed the pricing for pounds of methamphetamine. (Dec. 6 Tr. 67:21-68:9; Gov't Evidentiary Hr'g Ex. ("Ex.") 6 at 4.) During the call, Fuentes also referenced a $19,000 debt he owed to Diaz for purchases of drugs he had made from Diaz on credit. (Dec. 6 Tr. 68:20-22; Ex. 6 at 6.) Diaz also testified that the majority of the drugs he provided Fuentes was methamphetamine, but recalled giving him nine ounces (a quarter of a kilogram) of cocaine on one occasion. (Dec. 6 Tr. 68:21-69:1.) The court will therefore attribute three pounds of methamphetamine and nine ounces of cocaine to Fuentes based on this uncontroverted evidence.

As regiment commander, Fuentes also instructed individuals under him, including Nicolas Saldana, to pick up drugs from Diaz on his behalf. (<u>Id.</u> at 54:12-22.) Diaz testified that Saldana "picked up one-pound quantities of crystal methamphetamine on at least four occasions, different occasions" and that those four pounds were separate from the three pounds

Diaz provided directly to Fuentes.[2] (Dec. 7 Tr. 234:25-235:17.)
Not only are the drugs Saldana picked up from Diaz attributable
to Fuentes based on Diaz's testimony that Saldana picked them up
on behalf of Fuentes for the Merced regiment, Diaz also testified
that when Saldana was arrested while he was in possession of
drugs he had picked up from Diaz, Fuentes assumed the debt to
Diaz for the confiscated drugs. (Dec. 6 Tr. 55:6-23.)

Fuentes argues that the court should not rely on Diaz's
testimony about Saldana picking up four pounds of methamphetamine
from Diaz on behalf of Fuentes. First, Fuentes emphasizes that
Diaz had worked with Saldana before Fuentes started working with
Diaz, (see Dec. 7 Tr. 187:2-4, 242:18-20), thus Saldana could
have picked up some or all of the four pounds from Diaz before he
worked for Fuentes. The court finds it unlikely that Diaz
included any quantities given to Saldana before Saldana was
working for Fuentes because the questions clearly referred only
to drugs that Saldana picked up on behalf of Fuentes. (See id.
at 235:13-17.)

Second, Fuentes argues that notes taken by an
investigator during a debriefing with Diaz on August 1, 2007
discredit Diaz's testimony because the notes indicate only that
Diaz stated that the total amount of methamphetamine supplied to
Merced through Fuentes was three pounds. The omission of any

---

[2]    Fuentes requests that the court strike the following
sentence from paragraphs 26 and 35 of the PSR: "A confidential
source reported Nick Saldana picked up one pound of
methamphetamine on four separate occasions for the defendant."
This statement is consistent with Diaz's credible and
uncontroverted testimony at the hearing, thus the court will deny
Fuentes's request to strike that statement from the PSR.

reference to the four pounds Saldana picked up in the
investigator's notes does not discredit Diaz's testimony,
especially because the court has generally found live testimony
or a transcript of an interview to be more accurate than an
investigator's notes that may contain errors or omissions and
inevitably lack the context of statements.  Additionally, Diaz
told investigators about the four pounds provided to Saldana in
another FBI debriefing.  (See id. at 234:22-235:4.)  Overall, the
weight of the evidence persuades the court that Diaz's estimation
about the four pounds of methamphetamine delivered to Saldana was
limited to the time Saldana was working for Fuentes and was in
addition to the three pounds he testified were distributed to
Merced through Fuentes.  The court will therefore include that
four pounds of methamphetamine in calculating Fuentes's base
offense level.

        The government also argues that intercepted calls
between Fuentes and Diaz show that Fuentes and Diaz reached
additional agreements for the sale of drugs that should be
included in calculating Fuentes's base offense level.  Under the
Guidelines, an agreement to sell a specific quantity of drugs can
be considered in calculating a defendant's base offense level.
See U.S.S.G. § 2D1.1 cmt. n.12 ("In an offense involving an
agreement to sell a controlled substance, the agreed-upon
quantity of the controlled substance shall be used to determine
the offense level unless the sale is completed and the amount
delivered more accurately reflects the scale of the offense.").
In an intercepted call between Diaz and Fuentes on May 22, 2007,
Fuentes told Diaz about the possibility of obtaining a pound of

methamphetamine from someone in San Jose for $9,500 per pound and the possibility of exchanging a kilogram of their cocaine with that dealer. (See Dec. 6 Tr. 84:7-56:4; Ex. 11.) After recounting his conversation with the dealer in San Jose and discussing with Diaz the possibility of such a sale, the discussion about the potential sale ended with Fuentes saying, "I told Woody to see what's up, maybe we could come up on something." (Ex. 11 at 4.) Neither the intercepted call nor Diaz's testimony at the hearing prove that Fuentes or Diaz reached an agreement with the dealer in San Jose to conduct an exchange or sale of drugs. Discussions about a possible source of methamphetamine and possible purchaser for cocaine do not result in an "agreed-upon quantity of [a] controlled substance" sufficient to use in calculating Fuentes's base offense level.

Similarly, in a second intercepted call about two hours later that day, Fuentes told Diaz that he wanted to buy methamphetamine, but nothing in the conversation or Diaz's testimony indicates that they reached an agreement. At the time of the call, Diaz did not have methamphetamine to sell to Fuentes and was waiting to receive about three pounds. (Dec. 6 Tr. 89:10-15.) For example, Diaz told Fuentes that Fuentes's "guys didn't like" the methamphetamine Diaz had access to at the time and the other kind he could buy was too expensive. (Ex. 12.) Again, they discussed the possibility of purchasing them from the San Jose dealer. (Id.) As the call ended, Fuentes said, "Oh man, let me call Woody and see what, what we could do with Samuel, bro." (Id.; see also Dec. 6 Tr. 86:4-11 (Samuel is an NF carnal in San Jose).) From the evidence, the court concludes

13

that it was not likely that Fuentes and Diaz reached an agreement for the purchase of methamphetamine in that phone conversation and, if they subsequently reached an agreement, the amount was likely included in Diaz's estimate of the total quantity of methamphetamine he sold to Fuentes.

Lastly, the government argues that Fuentes is responsible for the multiple pounds of methamphetamine Diaz testified he purchased in the last two weeks of May 2007 and the ten pounds of methamphetamine in his possession when he was arrested on May 26, 2007. Diaz was arrested only five days after Fuentes's May 22 conversation with him in which Fuentes and Diaz did not come to an agreement about Fuentes purchasing methamphetamine from Diaz. Diaz did not testify that he was intending to sell any of that methamphetamine to Fuentes, and it is plausible that the ten pounds in Diaz's possession was the cheaper methamphetamine that Diaz had indicated that Fuentes's "guys" did not like. There is therefore insufficient evidence to establish that the drugs in Diaz's possession at the time of his arrest, or any drugs he purchased just prior to his arrest, were within the scope of the criminal activity that Fuentes undertook in selling methamphetamine in the Merced regiment.

Although the totality of the evidence leaves the court convinced that Fuentes was involved with more drugs than the specific quantities established through the evidence, the court must limit itself to the most conservative estimation based on the evidence. Accordingly, the court finds it more likely than not that Fuentes was directly involved with or agreed to jointly undertake criminal activity involving at least seven pounds of

14

methamphetamine and nine ounces of cocaine, providing for a base offense level of 34.[3]

C. <u>Base Offense Level for Castro</u>

The PSR for Castro explains that "it appears he was aware of all of the drugs being distributed by the DTO, and all of the criminal conduct of the DTO will be used to determine the offense level." The PSR thus recommends a base offense level of 38. Castro objects to the use of the highest level, arguing that the appropriate base offense level is 34.

Castro is a Norteño, and Diaz testified that he personally delivered methamphetamine to Castro on at least six occasions in 2006 and 2007. (Dec. 6 Tr. 99:6-17.) He testified that each delivery was "always" more than one pound of methamphetamine and explained, "in fact, the majority of the time it was over a pound. I mean, it was like -- sometimes in the beginning it was like five pounds, four pounds." (<u>Id.</u> at 99:21-24.) From this testimony, the government and Castro reach different estimates about the quantity of methamphetamine Diaz delivered to Castro. Castro contends that Diaz's testimony supports a finding of only twelve pounds, reasoning that two of

---

[3] In calculating the base offense level for each defendant, section 2D1.1 of the Guidelines provides for differing controlled substances to be converted to their marijuana equivalents in order to obtain a single base offense level. The section provides drug equivalency tables to calculate such conversions, and the marijuana equivalent for "methamphetamine (actual)" is significantly greater than the marijuana equivalent for just "methamphetamine." <u>See</u> U.S.S.G. § 2D1.1 cmt. n.10(D). Because neither the PSRs nor the government suggest that the marijuana equivalent for "methamphetamine (actual)" should be used, the court assumes that the methamphetamine defendants purchased and sold was not "methamphetamine (actual)" and will thus use the lower marijuana equivalent in calculating the base offense levels for defendants.

the deliveries were four pounds each and the remaining four
deliveries were one pound each.  The government, on the other
hand, argues that Diaz's testimony supports a finding of twenty
to twenty-five pounds, reasoning that at least four of the sales
were four or five pounds each.

"[W]hen choosing between a number of plausible
estimates of drug quantity, none of which is more likely than not
the correct quantity, a court must err on the side of caution."
Walton, 908 F.2d at 1302.  So long as Castro's estimate is
plausible in light of Diaz's testimony, the court must adopt his
lower calculation.  The difference in Castro's and the
government's calculations stems from the following testimony:

> Q: What were the -- do you recall, like, a number
> of pounds from during these six or so occasions?  More
> than one pound, less than a pound?
>
> A: No, it was more.  It was always -- in fact, the
> majority of the time it was over a pound.  I mean, it
> was like -- sometimes in the beginning it was like five
> pounds, four pounds.

(Dec. 6 Tr. 99:18-24.)  Castro's calculation of the first two
sales at four pounds each is plausible because Diaz testified
that "in the beginning it was like five pounds, four pounds."
Although the "beginning" sales may have also been at five pounds,
it is unclear from Diaz's testimony whether he was estimating
that one or more sales were for five pounds or he was uncertain
whether the "beginning" sales were for four or five pounds.  The
"beginning" sales could also include more than the first two
sales and, according to the government, the majority of the sales
were at the level of the "beginning" sales.  While such
interpretations are plausible, the court will err on the side of

caution and adopt the four pound estimate only for the first two "beginning" sales as it is the most conservative of the possible estimations.

However, Castro's estimate that the remaining sales were for only one pound each is not plausible in light of Diaz's testimony that a "majority" of the sales (at least four of the six sales) were "over a pound." The next two sales comprising of the majority of the sales must have thus been at a quantity that exceeded one pound. The court's impression from Diaz's testimony is that he primarily sold methamphetamine in pound increments and did not cut a packaged pound into lower quantities. The court therefore finds it most likely that a sale for "over a pound" would have been at least two pounds. Adopting the most conservative calculation that is plausible in light of Diaz's testimony, the court finds that at least two of the six sales were for two pounds because, taken with the first two sales for four pounds, this would result in a majority of the sales being over one pound. With the remaining two sales, because Diaz testified that the six sales were "always" for a pound, the only plausible estimate is that they were for at least one pound, and thus the court will adopt the most conservative estimate that the remaining two sales were for one pound each.[4] Accordingly, the most conservative calculation based on Diaz's uncontroverted testimony is that he personally delivered fourteen pounds to Castro and the court will therefore use this quantity in

---

[4]     Castro's conclusion that "a minority of the time, the deliveries were under a pound" is not plausible in light of Diaz's testimony. (See Dec. 6 Tr. 99:18-24.)

calculating Castro's base offense level.[5]

In an intercepted call with Diaz on April 5, 2007, Castro also discussed a pound of marijuana that he had received and given to another individual to sell. The court will therefore attribute that pound of marijuana to Castro in calculating his base offense level.

The PSR recounts an intercepted call between Castro and Diaz on April 17, 2007 in which Castro told Diaz he wanted to increase his prior order for five kilograms of cocaine to seven kilograms. Castro concedes that this agreement to purchase seven kilograms of cocaine from Diaz is attributable to him, (Docket No. 1054 at 6:12-14), and thus the court will include that quantity of cocaine in calculating his base offense level.

On May 24, 2007, Gomez was arrested and cocaine was seized from his home during a search. In an intercepted call with Diaz that day, Castro told Diaz about Gomez's arrest and asked Diaz whether Castro owed anything for drugs he had obtained from Diaz. (Ex. 23; Dec. 7 Tr. 138:19-139:5.) After Diaz informed Castro that Gomez owed $3,300 or $3,200 and that Diaz could not absorb the loss, Castro assured Diaz that he would take care of the debt. (Ex. 23.) Diaz explained at the evidentiary hearing that Castro discussed Gomez's debt with Diaz because clearing the debt was part of Castro's responsibility as a

---

[5]     Castro requests the court to strike the following two sentences from paragraph 52 of the PSR: "Between 2006 and 2007, on at least six occasions, Diaz and/or his associates would deliver methamphetamine to Castro. The deliveries would consist of anywhere between 1 pound up to 4 or 5 pounds of methamphetamine." (Docket No. 1054 at 13:19-14:4.) This summary is supported by Diaz's testimony and thus the Court will deny Castro's request to strike these two sentences.

regiment commander for San Francisco. (Dec. 7 Tr. 139:4-14.)
Because Diaz gave Gomez the cocaine as a member of the San
Francisco regiment and Castro agreed to take responsbility for
Gomez's remaining debt for the drugs, the cocaine was within the
scope of the criminal activity to which Castro agreed to jointly
undertake. Although Castro may not have known the quantity of
drugs Gomez had obtained from Diaz or whether his debt was
$33,000 or $3,300, the fact that Castro asked Diaz whether Castro
owed anything shows that it was reasonably foreseeable to Castro
that Gomez had obtained drugs from Diaz. The parties do not
dispute that the cocaine found at Gomez's residence and the drugs
giving rise to his debt were part of the two kilograms of cocaine
Gomez had obtained from Diaz, thus those two kilograms of cocaine
are attributable to Castro and will be included in calculating
his base offense level.

Based on the seven kilograms of cocaine he ordered and
two kilograms of cocaine Gomez obtained, the government contends
that the entire twenty kilograms of cocaine Diaz obtained in May
2007 are attributable to Castro. As previously discussed,
however, the scope of the criminal activity that Castro agreed to
participate in was limited to drug trafficking in his regiment,
not drug trafficking in all of the regiments under Diaz. As
previously discussed, while Diaz's ability to order significant
quantities based on the cumulative need of the regiments may have
allowed him to obtain a lower price, he testified that he set the
pricing for the drugs he sold according to the market in each
regiment and did not inform regiment commanders about the volume
of drugs provided to other regiments. (See id. at 218:2-21; see

19

also id. at 216:24-217:15 & Ex. 21 at 4 (although Castro knew about at least ten of the kilograms Diaz had obtained, Diaz testified that it was unlikely he knew about the entire twenty kilograms).)  Accordingly, because the kilograms of cocaine that were not supplied to the San Francisco regiment were beyond the scope of criminal activity that Castro agreed to jointly undertake, the entire twenty kilograms Diaz obtained in May of 2007 are not attributable to Castro.

The government also seeks to attribute additional purchases of methamphetamine and cocaine to Castro based on an intercepted call between Castro and Diaz on May 5, 2007.  During the conversation, Castro and Diaz discussed the pricing available for methamphetamine and cocaine in the Bay Area, but it is unclear whether Castro had purchased the drugs for the prices he quoted or was simply telling Diaz about the market price for drugs in the area.  When asked to "describe what [he] understood [Castro] to be telling [him] during that part of the call," Diaz explained only that Castro was telling him that "they have access to both cocaine and methamphtamines."  (Dec. 6 Tr. 131:13-16 (emphasis added).)  The court therefore finds that the conversation does not establish that Castro had either purchased or entered into an agreement to purchase methamphetamine or cocaine and thus the court will not attribute additional quantities to Castro based on the intercepted call.[6]

[6]    For the same reason, the court will grant Castro's request to strike the probation officer's interpretation of the call from the PSR, which is the last sentence of paragraph 30 and states, "Further, Castro states he got some methamphetamine and was waiting for the cocaine."

Lastly, the government seeks to attribute approximately five pounds of methamphetamine to Castro based on discussions Castro and Diaz had in intercepted calls about Castro having found someone to help "cook" methamphetamine or a source to obtain ephedrine to make methamphetamine. Although the "agreed-upon quantity" from an agreement to sell a controlled substance can be attributed to a defendant, see U.S.S.G. § 2D1.1 cmt. n.12, the evidence does not establish that Castro reached an agreement with the potential cook. Although Diaz was very interested in purchasing ephedrine from Castro's source, neither the intercepted calls nor Diaz's testimony show that Castro's source ever came to fruition or that an agreement was reached. The court will therefore not attribute any quantity of methamphetamine to Castro based on these discussions.

Accordingly, while the totality of the evidence leaves the court with the impression that Castro was involved with more drugs than the specific quantities discussed, the court will only attribute the conservative estimate of fourteen pounds of methamphetamine, nine kilograms of cocaine, and one pound of marijuana, which provides for a base offense level of 36.[7]

---

Castro also moves to strike the assertions in paragraph 61 of the PSR, "including but not limited to the assertion that Castro was involved 'in the buying and selling of multiple kilograms of cocaine and methamphetamine over a three year period.'" (Docket No. 1054 at 8:6-9.) Although striking the generalized summaries is unnecessary because they are consistent with the evidence from the evidentiary hearing, the court relies on the evidence presented at the hearing, not the summaries in the PSR.

[7]    Castro objects to the following sentence from paragraph 125 of the PSR: "The defendant was a major distributor of cocaine and methamphetamine for the [drug trafficking organization] in

1        D.   <u>Base Offense Level for Gomez</u>

2        In the PSR for Gomez, the probation officer explains

3    that Gomez "was aware of all the drugs being distributed by the

4    DTO, and all of the criminal conduct of the DTO will be used to

5    determine the offense level."  The PSR thus recommends a base

6    offense level of 38 for Gomez, and Gomez objects, arguing that

7    the appropriate level is 32.

8        Gomez is a Norteño[8] and was a regiment commander for

9    San Francisco in 2004.  (Dec. 6 Tr. 2:14-25, 5:1-10, 20-25.)

10   Diaz testified that he first met Gomez in 2004 and sold him

11   approximately two pounds of methamphetamine at their first

12   meeting.  (<u>Id.</u> at 2:14-3:13.)  Gomez concedes that these two

13   pounds of methamphetamine are attributable to him in calculating

14   his base offense level.  (Docket No. 1053 at 1:20-22.)  At the

15   evidentiary hearing, Diaz also estimated that, in 2004, he

16   supplied Gomez with no less than five pounds of methamphetamine.

17   (Dec. 6 Tr. 23:3-9.)  Diaz specifically recalled one instance

18   when Gomez purchased methamphetamine from him at an apartment in

19   _____

20   the Bay Area of California."  (Docket No. 1054 at 9:5-10.)
     Although use of the adjective "major" could be debated, the
21   sentence is consistent with the quantities the court has
     discussed and relies on, thus striking the sentence from the PSR
22   is unnecessary.

23       [8]   Gomez objects to the statements in paragraph 30 of the
     PSR that indicate that Gomez was "indoctrinated into the NF" in
24   2004 and was "given authority by Amaro to act as an NF member."
     Diaz testified that Gomez was only a Norteño and never an NF
25   member, (Dec. 6 Tr. 18:2-17; Dec. 7 Tr. 170:4-6), and Sandoval
     testified that he only assumed Gomez was an NF member because
26   another NF member introduced Gomez to him as a "loved one," which
     he interpreted to mean he was a member of the NF.  (Dec. 7 Tr.
27   6:22-25.)  The weight of the evidence suggests that Gomez was not
     an NF member, thus the court will strike the aforementioned
28   statements from paragraph 30.

2004 and that Sandoval had accompanied Gomez to the apartment.
(Id. at 7:9-14.)  Diaz testified that he and Gomez went into a
room privately and Gomez told him that he did not want Sandoval
to know the pricing for the drugs.  (Id. at 7:19-8:20.)

Sandoval's testimony corroborates Diaz's testimony that
Diaz supplied Gomez with at least five pounds of methamphetamine
in 2004 and that one purchase occurred in an apartment as Diaz
described.  Sandoval testified that he drove to Salinas with
Gomez on five or six occasions in 2004 and it was his
understanding that the purpose of the trips was for Gomez to pick
up drugs or drop off money.  (Dec. 8, 2011 Tr. ("Dec. 8 Tr.")
33:17-14, 35:8-36:4, 38:1-20.)  On the first trip, Sandoval
testified that Gomez had told him he had about $40,000 in cash
with him in a shoe box and that he saw Gomez bring the shoe box
into the apartment.  (Id. at 19:8-21.)  Gomez left in possession
of some type of object and told Sandoval that he had about a half
of a kilogram of cocaine and showed Sandoval what Sandoval
believed was a couple pounds of methamphetamine.  (Id. at 20:7-4,
22:21-23:6.)  Consistent with Diaz's recollection, Sandoval also
testified that Gomez had a discussion out of his presence at the
apartment and, when Gomez and Sandoval returned to the car, Gomez
told Sandoval that he had told the individuals in the apartment
that Sandoval did not know what was going on.  (Id. at 21:16-23.)

Based on Diaz's and Sandoval's testimony, the court is
persuaded by a preponderance of the evidence that Gomez obtained
at least five pounds of methamphetamine from Diaz in 2004 and
will thus attribute that quantity to Gomez.  With respect to
cocaine, Diaz testified that he supplied Gomez with cocaine but

23

could not recall a quantity. (Dec. 6 Tr. 23:10-17.) Based on Sandoval's uncontroverted testimony, the court finds that Diaz supplied Gomez with at least half of a kilogram of cocaine in 2004.

Diaz also testified that Gomez had incurred a substantial debt for drugs purchased from Diaz or his associates, (id. at 9:20-10:17; Dec. 7 Tr. 237:7-12), and Sandoval testified that the debt was approximately $17,000, (Dec. 8 Tr. 44:19-25). As a result of his debt, Gomez "abandoned" his position as regiment commander in San Francisco and his whereabouts were unknown. (Dec. 6 Tr. 10:16-22.) In Gomez's absence, Sandoval became one of the individuals in charge of San Francisco, (Dec. 8 Tr. 46:8-13), which made him one of the individuals responsible for Gomez's debt. Sandoval testified that, during the time Diaz and his associates were looking for Gomez to collect on the debt, he knew where Gomez was and began working with him to repay the debt.

To raise funds to repay Gomez's debt, Sandoval told Gomez to "give [Sandoval] some of his connections," meaning the "people that [Gomez] was selling pounds and selling kilos of cocaine to." (Id. at 61:3-13.) Sandoval testified that Gomez agreed to this arrangement and turned over his customers to Sandoval. Sandoval, who previously was unable to sell methamphetamine at the pound level, was then able to sell pounds of methamphetamine to Gomez's former customers and used part of

the proceeds to pay down Gomez's debt.[9]  (Id. at 62:19-63:5)

Sandoval specifically testified about two different customers

Gomez gave him, which were Mario Gonzales and "White Boy, Allen,"

(id. at 61:19-24), and that Allen was willing to buy drugs from

Sandoval because Allen had a personal relationship with Gomez and

knew about Gomez's debt, (id. at 64:5-14).  Although Gomez was

hiding from Diaz and the upper leaders in the conspiracy at this

time, the sales Sandoval made to Gomez's customers under their

arrangement to pay down Gomez's debt are attributable to Gomez

because Gomez knew that the drugs were coming from Diaz and his

associates and Gomez gave his customers to Sandoval so that

proceeds from the sales could be used to pay down his debt to

Diaz.  (Id. at 61:3-15.)

Sandoval estimated that he did approximately twenty-

five deals each with Gonzales and Allen in 2005 and 2006 and that

all of the deals were for at least a pound of methamphetamine,

with some for as much as five pounds.  (Id. at 62:10-18, 63:16-

22.)  These estimates would exceed fifty pounds of

methamphetamine, which dwarfs the estimates of sales discussed at

the evidentiary hearing.  The court also notes that Diaz never

estimated the quantity of drugs that he or his associates sold to

Sandoval in 2005 and 2006, and Sandoval did not testify that the

proceeds from every sale were used to pay Gomez's debt.  (See id.

at 66:23-15.)  With sales at this quantity, the court also finds

---

[9]     Diaz's testimony that he began working with Gomez again
because Gomez had "a lot of ties to San Francisco" and that "a
lot of people did know him," (Dec. 6 Tr. 25:2-9), corroborates
Sandoval's testimony about Gomez having significant customers
that he could pass on to Sandoval.

25

it likely that Sandoval's connection to the customers through Gomez became less significant as the sales continued. Given these considerations, the court will err on the side of caution and only attribute five pounds of methamphetamine to Gomez based on Sandoval's sales to Gomez's former customers in 2005 and 2006.[10]

Sandoval also testified that, during the time Gomez was "hiding" in the winter and spring of 2005, Sandoval provided him with cocaine he obtained from Diaz and Gomez was "involved in sales up to a kilo at a time." (Id. at 65:23-66:7, 67:25-68:4.) Sandoval testified that he would take Gomez to the area for a sale and that Gomez "would run and do his transaction and then come out to the car and give me the money." (Id. at 66:12-16.)

---

[10]     Gomez requests the court to strike the entirety of paragraph 38 from the PSR. The bulk of paragraph 38 recounts Gomez's involvement with producing a CD, "Game Untold," which was funded with money from drug sales and created to give the impression of a legitimate income. Sandoval testified to all of the details in the PSR about the CD and thus the court will not strike the paragraph. (See Dec. 8 Tr. at 27-33.)
      Paragraph 38 also states that, in 2005:

>     Gomez was connected to the NF during this time frame as he was selling pound quantities of methamphetamine and kilogram quantities of cocaine to "White Boy," also known as Mario Gonzalez, and "Al," also known as Alan Peters. Additionally, Gomez was allegedly getting the methamphetamine and cocaine from the Salinas regiment of the NF. Testimony presented indicated in 2005, at least 6 kilograms of cocaine as sold to Gomez.

(PSR ¶ 38.) Although these statements generally reflect Sandoval's testimony at the evidentiary hearing, there are several errors, such as the fact that Sandoval testified that he, not Gomez, was selling to "White Boy, Allen" and Gonzalez and that he only supplied Gomez with cocaine. In determining quantities attributable to Gomez for these transactions, the court relies only on Sandoval's testimony at the evidentiary hearing and, to the extent the statements in paragraph 38 conflict with Sandoval's testimony at the evidentiary hearing, the court strikes the statements from the PSR.

He explained that the profits were used to pay Gomez's debt, but that he would let Gomez "take a couple hundred bucks just for expenses." (Id. at 66:17-22.) Sandoval estimated that he provided Gomez with cocaine during this period "seven times maybe" and that on some occasions it was a full kilogram and on other occasions it was less than a kilogram. (Id. at 68:5-18.) Although Sandoval did not estimate the total quantity of cocaine he provided to Gomez during this period, his testimony persuades the court that it was more likely than not that Gomez sold at least one kilogram of cocaine during that period, thus the court will attribute one kilogram of cocaine to Gomez based on those sales.

At some point in 2006, Diaz began dealing with Gomez again after Gomez's debt was paid. (Dec. 6 Tr. 14:23-15:2.) Diaz estimated that, in 2006 and 2007, he or his associates supplied Gomez with no less than three pounds of methamphetamine and no less than two kilograms of cocaine. (Id. at 21:23-22:25.) Diaz's testimony about supplying methamphetamine and cocaine to Gomez during 2006 and 2007 is corroborated by several intercepted calls between Gomez and Diaz in which they discussed Gomez's drug orders.[11] (See Exs. 3-5; see also Dec. 6 Tr. 35:17-11, 37:22-38:3, 40:19-41:6, 42:22-43:9 (Diaz's testimony about the intercepted calls); Dec. 7 Tr. 154:18-25 (same).) Gomez has also conceded that Diaz supplied him with two kilograms of cocaine in

---

[11] The court will not attribute the quantities discussed in the calls on April 15, 2007, April 17, 2007, and May 23, 2007 to Gomez because Diaz estimated the "total" amount of drugs he supplied to Gomez during that time period; thus it is more likely than not that Diaz's estimate included purchases discussed in the intercepted calls.

May of 2007, a half of a kilogram of which was in Gomez's possession when he was arrested that month. (Docket No. 1053 at 1:22-24.) The court will therefore attribute the three pounds of methamphetamine and two kilograms of cocaine to Gomez in calculating his base offense level.

While the court's conservative estimates lead to a total of three-and-a-half kilograms of cocaine that Gomez was directly involved with, in his Acceptance of Responsibility Statement submitted to the court, Gomez wrote, in his own handwriting, "I did conspire with Mario Diaz to sell more than 500 G of Meth and at least 5 KG of cocaine." The court's estimate, therefore, clearly errs on the side of leniency. Nevertheless, the court will only attribute a total of three-and-a-half kilograms of cocaine to Gomez in calculating his base offense level.

In an intercepted call March 24, 2007, Gomez and Diaz also discussed methamphetamine that Gomez purchased from a dealer other than Diaz or his associates. In the call, Gomez and Diaz discussed at least one pound of methamphetamine that Gomez had already purchased from the other dealer and Gomez indicated that he "got rid of the one I had" and that the "white boys" he sold it to said it was "really strong." (Ex. 1 at 2-3.) During the call, Diaz also indicated that he wanted Gomez to get additional methamphetamine from the other dealer and the two agreed that Gomez would get an additional two pounds for Diaz. (Id. at 3-4.) Based on the intercepted call and Diaz's testimony about it, (see Dec. 6 Tr. 27:9-30:1), the court finds it more likely than not that Diaz obtained one pound of methamphetamine from a dealer

28

other than Diaz and, based on the agreement, supplied Diaz with
at least two pounds of methamphetamine from that dealer. Because
these additional three pounds of methamphetamine are separate
from the total quantity of methamphetamine Diaz estimated he
supplied to Gomez, the court will include the three pounds in the
total quantity attributed to Gomez.

The court will not, however, attribute additional
quantities based on the intercepted call on May 23, 2007. In
that call, Gomez and Diaz discussed prices for methamphetamine
that Gomez had access to, but Gomez agreed only to look into the
quality a little more and it does not appear that they reached an
agreement for the sale of methamphetamine. (Ex. 3 at 3-4.) Diaz
also testified that "everybody fishes in the market out there . .
. saying, you know, I can get it for this price to see if they
can get you to lower it" and that he felt Gomez was lying or
"BSing" at times because his statements about what he could get
for particular prices did not always make sense. (Dec. 7 Tr.
158:13-159:8.) Sandoval also testified that Gomez was often
untruthful and told lies. (Dec. 8 Tr. 103:18-104:25.)
Similarly, although the call shows that Gomez had knowledge about
a prospective trade with an individual who wanted twenty-five
kilograms of cocaine in exchange for methamphetamine, the court
is not persuaded that an agreement was reached for such a trade.
(See Dec. 6 Tr. 41:15-42:13.) The court will therefore not
attribute additional pounds of methamphetamine to Gomez based on
this conversation.

For the same reasons discussed with respect to Castro,
the court will not attribute the entire twenty kilograms of

cocaine Diaz obtained in May 2007 to Gomez. As previously discussed, the scope of the criminal activity Gomez agreed to jointly undertake was limited to the San Francisco regiment and Diaz testified that Gomez did not have a role in Diaz obtaining the twenty kilograms of cocaine and Gomez was only one of the multiple "customers" Diaz had. (See Dec. 7 Tr. 167:20-168:9.) Additionally, Gomez was no longer leading the San Francisco regiment in 2007, thus making it less likely that Diaz's entire purchase of cocaine could be attributed to him.

Lastly, the court will not attribute any quantity of marijuana to Gomez based on a robbery of a marijuana trafficker that Sandoval testified occurred sometime in 2003. Although the robbery was conducted by lower-level members of the San Francisco regiment, it occurred before the conspiracy charged in this case. It was also unclear from Sandoval's testimony whether Gomez knew about it before it occurred, (Dec. 8 Tr. 12:14-13:14), and Sandoval testified only that he assumed part of the proceeds were given to Gomez. (See id. at 13:17-14:25.)

As with the other defendants, the totality of the evidence persuades the court that Gomez was directly involved with or agreed to jointly undertake criminal activity involving more than the precise quantities the court can pinpoint from the evidence. Nonetheless, the court will limit its calculation to the most conservative estimates supported by the evidence and therefore finds that Gomez is responsible for at least sixteen pounds of methamphetamine and at least three-and-a-half kilograms of cocaine, which results in a base offense level of 36.

///

III.  Aggravating Role Enhancement

        The PSR for each defendant recommends that each defendant be given a two level aggravating role enhancement pursuant to section 3B1.1(c) of the Guidelines.  All three defendants object to an aggravating role enhancement.  Section 3B1.1 provides for the following increase to a defendant's offense level based on the defendant's role in the offense:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.

        An increase to an offense level for an aggravating role is appropriate if a preponderance of the evidence supports a finding that the defendant occupied one of the specified roles. United States v. Maldonado, 215 F.3d 1046, 1050 (9th Cir. 2000); United States v. Avila, 95 F.3d 887, 889 (9th Cir. 1996).  To determine "whether a defendant was an organizer or leader, as opposed to a manager or supervisor," the court should consider the following factors:

> "[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."

Avila, 95 F.3d at 889-90 (quoting U.S.S.G. § 3B1.1 cmt. n.4).

31

"[T]o sustain a finding that a defendant was an organizer or a
leader, 'there must be evidence that the defendant exercised some
control over others involved in the commission of the offense [or
was] responsible for organizing others for the purpose of
carrying out the crime.'" Id. at 889 (quoting United States v.
Harper, 33 F.3d 1143, 1151 (9th Cir. 1994)).

It is undisputed that the drug trafficking conspiracy
giving rise to this criminal case had more than five
participants. Some of the defendants contend, however, that the
regiments they led had less than five participants. The Ninth
Circuit has held that "[a]n enhancement under §§ 3B1.1(a) or (b)
does not require control over all of the five or more
participants." United States v. Garcia, 497 F.3d 964, 970 (9th
Cir. 2007). "While an enhancement under section 3B1.1(a) or (b)
is proper only in a criminal activity involving more than five
participants, there is no requirement . . . that the defendant
exercise authority over at least five participants before the
enhancement can be applied." United States v. Barnes, 993 F.2d
680, 685 (9th Cir. 1993). At the same time, the Ninth Circuit
has explained that the exercise of authority over only one other
participant does not preclude the enhancement as a matter of law,
but "would perhaps be insufficient to support the enhancement
[if] there was no other indication of leadership." Id.

A.    Aggravating Role Enhancement for Fuentes

The PSR indicates that Fuentes "appears to have been a
supervisor" and recommends a two level enhancement under section
3B1.1(c). When Diaz first met Fuentes in 2006, Fuentes was a
Norteño and had been given "full authority" to establish a

32

regiment in Merced from James Perez, a high-ranking NF member who was incarcerated at Pelican Bay prison. (See Dec. 6 Tr. 45:21-47:22.) After Fuentes met with Diaz, Diaz agreed that Fuentes would be the regiment commander of Merced and instructed Fuentes to report to Diaz, not Perez. (Id. at 49:8-51:10.) Diaz testified that, as the regiment commander of Merced, Fuentes was "there front and center," had "been upgrading everything," and, "[s]ince when we started working with him, thing started falling more in place, things started getting more structured, more organized." (Id. at 61:20-24.)

As the regiment commander of Merced, Diaz testified that Fuentes "was in charge of all Merced functions," that "[a]nything Merced County that was going on over there, he was the go-to guy there," and that Fuentes was actively supervising and managing individuals in the Merced regiment. (Id. at 52:19-53:2.) Diaz identified at least seven individuals who were under Fuentes's authority in the Merced regiment, including "Woody," Nicolas Saldana, Julian Zotelo, "Dee," "Listo," "Sammy," and Jesse Zotelo. (Id. at 53:3-54:11.) As regiment commander, Fuentes obtained drugs from Diaz and then distributed the drugs to participants under his authority. Even after Fuentes distributed the drugs to the participants under him, the responsibility to pay Diaz for the drugs remained with Fuentes. For example, Diaz testified that Saldana was arrested while in possession of drugs and that Fuentes paid Diaz for the debt resulting from the seized drugs. (Id. at 55:10-56:1.) As regiment commander, Fuentes also had the responsbility to "have sort of a bank in the regiment so when events like [arrests]

33

occur, they could pay for lawyer fees or, you know, whatever the regiment needs." (Id. at 67:4-10.)  The evidence at the evidentiary hearing also established that, when Saldana was arrested, Fuentes assumed the responsbility to pay for Saldana's lawyer fees.  (Id. at 67:4-13.)

Diaz also testified about an instance when Fuentes reported to Diaz that Listo, one of the individuals in Fuentes's regiment, was "messing up," using drugs, and becoming more of a "liability" than an "asset" for the organization.  (Id. at 70:3-9.)  Diaz testified that, as Listo's supervisor, Fuentes was expected to take care of the issue and Fuentes told Diaz that, because Listo owed money to the Merced regiment, Fuentes took a bulletproof vest and other items from Listo to "get everything he could from [Listo] before he either got in trouble or something happened where he wouldn't get nothing in return for the debt that Listo owed."  (Id. at 70:17-25.)

The testimony at the evidentiary hearing also established that Fuentes had a significant role within the Norteño and NF organizations.  First, Perez had given Fuentes authority to act as a "sponsor" and "pull" a new member into the Norteño gang, and Diaz testified that Fuentes acted on this authority and "pulled" an individual named "Woody" from San Jose into the Norteño gang.  (Id. at 47:22-10, 54:3.)  Second, Diaz credibly testified that Fuentes was indoctrinated into the NF in 2007.  Once Fuentes was an NF member, Diaz testified that he would solicit Fuentes's input about incidents involving Fuentes's regiment.  (See id. at 62:7-63:12; id. at 87:20-88:2 ("You know, basically even before [Fuentes] became an NF member, he was

34

already awarded that authority [in Merced].  So if [incidents]
came to him, I mean, we [(Diaz and Amaro)] would let him know,
include him in it.  But basically he probably wouldn't have no
say.  Like, we wouldn't take, you know, his word at value.  I
mean, we would just, like, you know, deal with it ourselves.  But
we would get his input now that he was an NF member, see what he
thought about the incident.").)  Third, when Fuentes was
arrested, kites were found at his residence and Diaz testified
that Fuentes would have received kites because, "since he's in
charge of that area, he's in charge of everything that goes on in
Merced, not just -- not just the streets, but in the county jail
as well.  So, therefore, he will be abreast of what's going on in
jail."  (Id. at 60:7-13.)

        Overall, in the context of the limited quantity of
drugs that were attributed to him, Fuentes had a significant
management and supervisory role over at least seven individuals
within his Merced regiment.  Especially with his increased
influence once he became an NF member, it would be reasonable to
consider him a lower-level leader within the drug trafficking
operation.  The court finds that the evidence clearly supports a
two level aggravating role enhancement and, because the number of
participants in the drug trafficking operation and even those
directly under Fuentes exceeded five, the evidence likely
justifies a three or even four level role enhancement.  In light
of the probation officer's recommendation for only a two level
enhancement and the lack of an express objection by the

35

government to that recommendation,[12] the court will give Fuentes
the benefit of the doubt and only assess a two level enhancement
under section 3B1.1(c).

B.     Aggravating Role Enhancement for Castro

The PSR recommends a two level enhancement under
section 3B1.1(c) for Castro, stating that he "was a leader and
distributor" in San Francisco for the drug trafficking conspiracy
and that, "[w]hile he operated under the direction of Amaro (who
was the leader of the conspiracy), and Diaz, he managed
coconspirators in the Bay Area along with Gomez." (PSR ¶ 62.)
Castro objects to the assessment of a leadership enhancement.

At the evidentiary hearing, Diaz testified that
initially in 2005 and for part of 2006, Castro had an "active
role[]" in the conspiracy, but co-defendant Bismark Martin Ocampo
had primary authority in San Francisco and Castro reported to
him. (See Dec. 6 Tr. 98:6-99:2, 102:1-12.) At that time, Castro
was "picking up all of the drugs" and "was the one that was kind
of on the streets all the time dealing with the day-to-day, you
know, issues and stuff, and he would report to Mr. Ocampo in
early 2006." (Id. at 98:6-15, 102:1-12.) Based on Castro's
involvement in 2005 and into part of 2006, the court finds it

_____

[12]     In its response to Fuentes's sentencing objections, the
government states, "FUENTES, in fact, should be assessed a three
or four level upward adjustment based on the number of
individuals he actively supervised during this conspiracy."
(Docket No. 1065 at 10:11-13.) In its Sentencing Recommendation,
however, the government did not object to the offense level in
the PSR or advocate for an increased role enhancement. (See
Docket No. 1066 at 4:1-3.) The government's statement in its
response to Fuentes's sentencing objections is therefore
insufficient to put Fuentes on notice that the court would
consider a three or four level role enhancement.

more likely than not that he was only a manager or supervisor in the drug trafficking organization, but was not a leader.

When Ocampo was arrested in 2006, however, Diaz explained that Castro "was there, so we just kept dealing [drugs] with him," (id. at 102:13-20), and, at some point in 2006, he "was handling things for -- for the organization in San Francisco" and became a regiment commander for San Francisco, (id. at 16:11-18; see also Dec. 7 Tr. 233:17-20). Diaz identified nine individuals under Castro's authority in 2007, including Gomez, Sandoval, "Coco," Daniel Zapeta ("Termite"), "Mondo," "Bazil," "Cheech," "Dopey," and "Bam Bam." (Dec. 6 Tr. 25:10-19, 101:16-25, 105:11-15; Dec. 7 Tr. 136:21-137:13, 139:6-14.) Castro also took responsibility to pay for Ocampo's lawyer, (Dec. 6 Tr. 115:9-18), and to "open up new avenues" for his regiment to obtain and make methamphetamine in 2007. (Id. at 109:12-25, 120:10-20; Exs. 13, 16.)

At the same time, however, Diaz testified that he dealt drugs directly with other regiment members in San Francisco because he had already been doing so prior to Castro assuming authority. (Dec. 7 Tr. 229:22-230:5, 230:20-231:1.) Castro thus did not have "full authority" over all of the drugs in the San Francisco regiment, but had authority over "all the politics and stuff and issues" and if there was a "violation" by a regiment member, such as a member dating another member's girlfriend, it was Castro's responsbility to "launch an investigation and see

what's going on."[13]  (Id. at 230:1-231:9.)

When Ocampo was released, the evidence from the hearing revealed that the San Francisco regiment had internal conflicts and disputes over leadership. (See Dec. 6 Tr. 111:15-112:8, 115:19-21.)  The disputes over leadership between at least Castro and Ocampo culminated in a meeting on March 26, 2007, and it was decided that Castro would remain the regiment commander for San Francisco and Ocampo would be given authority east of San Francisco. (Id. at 39:2-5.)  Castro argues that he should not be assessed a two level enhancement because this meeting did not occur until the day Diaz was arrested.  Although Diaz was arrested that day, the evidence does not suggest that the conspiracy immediately terminated upon Diaz's arrest, (see Dec. 7 Tr. 231:22-232:3), and Castro entered a guilty plea to a conspiracy that ended on or about June 27, 2007.  Regardless, Castro's role in the offense before the meeting on May 26, 2007 is sufficient to justify a two level enhancement under section 3B1.1(c).  Diaz's credible and uncontroverted testimony also established that the decision at the meeting was that Castro would "remain with full authority of the San Francisco regiment," not be given authority for the first time that day. (See Dec. 6 Tr. 38:19-24, 96:13-16; Dec. 7 Tr. 224:1-8, 225:25-226:10, 229:7-19.)

At a minimum, Castro served a significant management

---

[13]    Based on Diaz's testimony that Castro did not have full authority over the drugs distributed to the San Francisco regiment, the court will grant Castro's request to strike the statement in paragraph 52 of the PSR that "in 2006/2007 Castro was given full authority over the San Francisco regiment after Ocampo was arrested."

and supervisory role in San Francisco and, while he did not have full authority over all of the narcotics for the region, he was at least one of the leaders in San Francisco.[14]  Moreover, because Castro is only being held responsible for the limited quantity of drugs he was personally involved with in his regiment, his leadership over those drugs is sufficient to support a leadership role enhancement.  The evidence therefore clearly supports the recommended two level enhancement under section 3B1.1(c) and, while a three or four level enhancement may be merited, the court will not assess a greater enhancement in the absence of an objection to the two level recommendation by the government.[15]

   C.   Aggravating Role Enhancement for Gomez

        For Gomez, the PSR recommends a two level enhancement under section 3B1.1(c) and states that Gomez "was a leader and distributer of marijuana, cocaine, and methamphetamine for the Diaz [drug trafficking organization] in the San Francisco, California, regiment" and "managed coconspirators in the Bay

_____

[14]    Castro requests the court to strike the following sentence from paragraph 125 of the PSR: "However, he also was in a position of authority over a geographical area where he managed other conspirators making his activities vital to the success of the drug organization." (Docket No. 1054 at 9:11-16.)  The court finds that this synopsis is consistent with the evidence from the hearing and, while the court relies on the evidence, not the synopsis in the PSR, it is unnecessary to strike the sentence from the PSR.

[15]    Again, while the government argues in its response to Castro's sentencing objections that a four level enhancement is more appropriate, (see Docket No. 1064 at 12:4-7, 13:4-7), it did not object to the probation officer's recommended offense level and adhered to it in its Sentencing Recommendations. (See Docket No. 1066 at 3:20-23.)  Castro therefore did not receive notice that the court would consider a three or four level role enhancement.

39

Area." Gomez objects to an aggravating role enhancement.

Diaz testified that when he first met Gomez in 2004, Gomez was a Norteño and Amaro told him that Gomez "was handling things for the NF in San Francisco." (Dec. 6 Tr. 5:1-4.) Diaz explained that Gomez "was basically like the RC [(regiment commander)] out there" and "had a leadership role in the San Francisco area, so any issues or drug transactions were going to be through him." (<u>Id.</u> at 2:14-25, 5:1-10, 20-25.) Diaz explained that drugs were delivered to Gomez and then Gomez would distribute them to "his manpower" and was responsible for the debt incurred for the drugs. (<u>Id.</u> at 11:17-23.) At that time, Amaro had told Diaz that there were about fifteen participants working under Gomez for the San Francisco regiment, although the only two Diaz knew during that time were "Ray Ray" and "G." (<u>Id.</u> at 11:24-12:11.)

Sandoval's testimony corroborates Diaz's testimony about Gomez's leadership position in San Francisco. Specifically, Sandoval testified that an NF carnal introduced him to Gomez and that Gomez was serving as the carnal's "right-hand man" and assumed authority when the carnal went to prison. (Dec. 8 Tr. 6:14-7:7.) He also testified that Gomez was "in charge of San Francisco in 2003" and when some of the lower members robbed a marijuana trafficker, it was Sandoval's understanding that the "contributions" to the NF were paid through Gomez. (<u>Id.</u> at 12:18-19, 14:4-8, 42:2-5.) Sandoval testified that there were only about four participants in the San Francisco regiment in 2004. (<u>Id.</u> at 116:8-20.)

The court recognizes that Gomez abandoned his position

40

in San Francisco when he incurred a significant debt to the
organization and, even after he began selling drugs again, it was
unlikely that he would return to a leadership position in the
future. (See Dec. 6 Tr. 24:13-25:5; Dec. 7 Tr. 227:19-228:3;
Dec. 8 Tr. 46:10-13.) Nonetheless, his abandonment of his
leadership position and lower level within the conspiracy when he
began selling drugs again does not diminish the role he had in
San Francisco in 2004 especially when viewed in the context of
the limited quantity of drugs attributed to him. At a minimum,
the evidence at the hearing establishes that Gomez served as a
manager or supervisor for the San Francisco regiment in 2004.
Accordingly, the court will assess a two level aggravating role
enhancement against Gomez pursuant to section 3B1.1(c).

IV. Gun Enhancement for Gomez

Section 2D1.1(b)(1) of the Guidelines increases the
offense level by two points "[i]f a dangerous weapon (including a
firearm) was possessed" by the defendant. For Gomez, the PSR
recommends a two level enhancement under section 2D1.1(b)(1) and
states that, when Gomez's home was searched incident to his
arrest in 2007, the officers found a .25 caliber firearm and
rounds of .45 caliber ammunition on a portable closet in the
downstairs bedroom. (PSR ¶ 26.) In the upstairs bedroom, the
officers also found a safe containing a pink .25 caliber firearm
and a magazine containing live rounds of .25 caliber ammunition.
(Id.)

With respect to the gun found in the downstairs
bedroom, Gomez submitted a declaration from Evette Lacome and a
Report of Investigation from an interview with Alan Peters.

41

According to these submissions, Lacome and Peters are a married couple who were renting the downstairs bedroom of Gomez's home. The unit had one bedroom and one bathroom and a separate entrance off of the inside of the garage that was secured with a dead-bolt. Lacome and Peters believed that Gomez did not have a key to the dead-bolt. Peters also told the investigator that Gomez had nothing to do with anything in his apartment.

With respect to the pink gun found upstairs, Gomez submitted a declaration from his wife, Cynthia Gomez. She indicated that the pink gun belonged to her and that she obtained it prior to her marriage to Gomez. She kept it in a safe and had lost the key to the safe, thus the officers found the gun only after they broke the safe open during the search.

At the evidentiary hearing, the government did not put on any evidence to rebut these statements, and the government did not address the firearm enhancement in its briefing. Based on the uncontroverted statements Gomez submitted, the court finds that the government has not established that Gomez owned or had access to either of the guns found during the search of his home. The court will therefore not increase his offense level by two points under section 2D1.1(b)(1).

V.    Third Level Acceptance of Responsibility Reduction

Section 3E1.1 provides for a two level reduction if "the defendant clearly demonstrates acceptance of responsibility for his offense" and an additional one level reduction if:

> the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his

own misconduct by timely notifying authorities of his
        intention to enter a plea of guilty, thereby permitting
        the government to avoid preparing for trial and
        permitting the government and the court to allocate their
        resources efficiently, decrease the offense level by 1
        additional level.

U.S.S.G. § 3E1.1(b). "[T]he government has been vested with

broad discretion to determine when the § 3E1.1(b) adjustment is

appropriate." Johnson, 581 F.3d at 1001 (quoting United States

v. Medina-Beltran, 542 F.3d 729, 731 (9th Cir. 2008)) (internal

quotation marks omitted) (alteration in original); see also

U.S.S.G. § 3E1.1 cmt. n.6 ("The timeliness of the defendant's

acceptance of responsibility is a consideration under both

subsections, and is context specific . . . [and] the Government

is in the best position to determine whether the defendant has

assisted authorities in a manner that avoids preparing for

trial."). "A district court may review the government's refusal

to file a § 3E1.1(b) motion and grant the additional one-level

reduction sua sponte if it finds that the decision was (1)

animated by an unconstitutional motive (e.g., racial

discrimination), or (2) arbitrary--i.e., not rationally related

to a legitimate governmental interest." Johnson, 581 F.3d at

1001. "[A] defendant who challenges the government declining to

move for a third level of acceptance of responsibility has a

threshold evidentiary burden to show unconstitutional motive, or

arbitrary governmental action." United States v. Espinoza-Cano,

456 F.3d 1126, 1136 (9th Cir. 2006).

        With respect to Gomez, the government did not move for

a third level acceptance of responsibility reduction because

Gomez "decided to enter guilty pleas only after the government

                            43

could no longer avoid preparing for trial." (Docket No. 1060 at 20:24-25.) Gomez objects, arguing that his guilty plea was timely and that the government is arbitrarily withholding the third level reduction from him. "[T]he timeliness of a defendant's decision to plead guilty will necessarily depend on the extent of trial preparation already undertaken prior to the plea and the decision's proximity in time to the trial date." United States v. Hopper, 27 F.3d 378, 385 (9th Cir. 1994).

Here, Gomez did not enter a guilty plea until this case had been pending for almost four years and only twenty-two days remained before his confirmed trial date. On November 15, 2010, the court set Gomez's trial date for April 26, 2011 and, at the trial confirmation hearing on March 28, 2011, Gomez confirmed his trial date and the government estimated that the trial would last approximately ten days. After confirming his trial date, defendant filed a notice of intent to plead guilty and the court ultimately accepted his open guilty plea on April 4, 2011 and vacated his trial date.[16]

In its response to Gomez's sentencing objections, the government has identified, in detail, the extensive and time-consuming preparation it completed in anticipation of Gomez's trial, including flying outside of California with the FBI case agent between February 27, 2011 and March 4, 2011 to have Diaz

---

[16]   Although defendant filed a notice of intent to plead guilty on March 29, 2011, the government represents that it continued to prepare for trial until the plea was actually taken because it "had no guarantee the defendant would follow through with his 'intent' to plead guilty." (Docket No. 1060 at 23:14-21.)   The government was not unreasonable in continuing to prepare for trial until the trial date was vacated.

review the numerous wiretapped calls involving Gomez.  Between
March 4 and the trial confirmation on March 28, the government
began preparing trial subpoenas for an anticipated thirty to
forty trial witnesses.  After the trial confirmation hearing, the
government "began the process of culling all of the available
intercepted wiretap calls between GOMEZ and DIAZ down to a
manageable number of calls to be introduced at trial" and marking
the selected calls as anticipated trial exhibits.  (Docket No.
1060 at 22:25-28.)  After the trial confirmation hearing, the
government prepared and served additional subpoenas on
anticipated trial witnesses and made preparations through the
Department of Justice and United States Marshals Service to have
two witnesses in the Witness Security Program available for
trial.

Based on the time-consuming trial preparation the
government undertook in February, March, and April, the court
finds that the government was justified in declining to move for
the third level reduction under section 3E1.1(b) because Gomez's
guilty plea was not timely and did not permit the government to
avoid preparing for trial or allocate its resources efficiently.
Moreover, Gomez's reliance on the fact that the government has
moved for the third level reduction for most of the other
defendants in this case who have pled guilty does not demonstrate
that the government acted unconstitutionally or arbitrarily in
its decision to withhold the reduction in his case.  The court is
confident that the government weighed the relevant considerations
and made individual assessments for each defendant to determine
whether the defendant's guilty plea allowed the government to

45

avoid preparing for trial and efficiently allocate its resources.

Citing United States v. Lee, 653 F.3d 170 (2d Cir. 2011), Gomez contends that the government wrongfully withheld the third level reduction because his open plea necessitated the government to prepare for and participate in the evidentiary hearing. In Lee, the Fourth Circuit held that it was "unlawful" for the government to withhold a third level reduction based on the "grounds that it had been required to prepare for a Fatico hearing" because the defendant pled guilty without a plea agreement and the defendant's objections to the PSR necessitated an evidentiary hearing. Lee, 653 F.3d at 173. The Fourth Circuit first reasoned that "the plain language of § 3E1.1(b) refers only to the prosecution resources saved when the defendant's timely guilty plea 'permit[s] the government to avoid preparing for trial'" and a Fatico evidentiary hearing is not a "trial." Id. at 174 (quoting U.S.S.G. § 3E1.1(b)) (alteration in original). Similarly, the Fourth Circuit emphasized that "the Application Notes for § 3E1.1 [] refer only to the government's ability 'to determine whether the defendant has assisted authorities in a manner that avoids preparing for trial.'" Id. (quoting U.S.S.G. § 3E1.1 cmt. n.6). Lastly, the Fourth Circuit reasoned that "a defendant--even one who pleads guilty--has a due process right to reasonably contest errors in the PSR that affect his sentence" and should not be punished for doing so.[17]

---

[17]    The government has not relied on the resources it expended in preparing for the evidentiary hearing to justify its withholding of the third level reduction, and moved for the third level reduction for Fuentes and Castro.  The court, therefore, does not rely on the time expended in preparing for and

46

The Fourth Circuit's decision in <u>Lee</u> appears to be inconsistent with Ninth Circuit precedent. Unlike the Fourth Circuit in <u>Lee</u>, the Ninth Circuit has not employed an impractical and narrow reading of section 3E1.1(b) and has explained that, "[w]hen § 3E1.1(b) speaks of conserving government resources in the 'prosecution' of the defendant's 'misconduct,' it means more than simply trial preparation." <u>Johnson</u>, 581 F.3d at 1002. "'Prosecution' is commonly understood to encompass the entirety of the criminal proceedings in a particular case until judgment is final and certain." <u>Id.</u> In <u>Johnson</u>, the Ninth Circuit held that "the allocation and expenditure of prosecutorial resources for the purposes of defending an appeal is a rational basis for declining to move for the third reduction point." <u>Id.</u>

As support for its holding in <u>Johnson</u>, the Ninth Circuit cited <u>United States v. Sainz-Preciado</u>, 566 F.3d 708 (7th Cir. 2009), which is directly on point with the case at hand. In <u>Sainz-Preciado</u>, the defendant pled guilty to drug charges in the indictment and thus "spared the expense of a trial," but did not admit his involvement in all ten drug transactions charged, thus necessitating an evidentiary hearing "to prove the full scope" of his criminal conduct. <u>Sainz-Preciado</u>, 566 F.3d at 716. The Seventh Circuit held that the "added burden to both the government and the court system [caused by the sentencing hearing] gave the government good reason (if it needed one) not to file a § 3E1.1(b) motion." <u>Id.</u>

---

participating in the evidentiary hearing in finding that the government did not unconstitutionally or arbitrarily withhold the third level reduction from Gomez.

In this court's humble opinion, giving any of these three defendants even a two point reduction for acceptance of responsibility under section 3E1.1(a), much less an additional point under subsection (b), is ludicrous. If just pleading guilty is synonymous with accepting responsibility, then these defendants deserve the two point reduction. But if any more is required, this court fails to see why they should be entitled to such a benefit. The gravamen of this case with respect to these defendants lies in the quantity of drugs involved and the defendants' respective roles in the conspiracy. To simply come into court almost four years after being indicted and admit to the bare bones of the charges and then put the government to its proof on the all issues that make the most difference in sentencing should not, in this court's view, constitute acceptance of responsibility.

Beyond that, the additional point reduction under subsection (b) is supposed to be reserved for those defendants who have assisted the authorities in the investigation or prosecution and permitted the government "and the court" to allocate their resources more efficiently. The court would be hard pressed to find that even Castro and Fuentes have done anything substantial to assist the court in allocating its resources. Technically, these defendants may have permitted the government and the court to avoid a "trial" in the literal sense. But to the extent that a trial is viewed as the questioning of witnesses on direct and cross-examination, the presentation of evidence and arguments, and the rendering of a decision by the trier of fact, from which the defendants may appeal, for all

practical purposes the sentencing hearing through which these
defendants put the government and the court was as much of a
trial as most others.  Indeed, the court cannot recall when it
has been called upon to devote more time and effort to any
sentencing proceeding.

Nevertheless, the government has for some reason deemed
it appropriate to move the court to give all three of these
defendants credit for acceptance of responsibility under section
3E1.1(a) and to further give Castro and Fuentes an additional
point reduction under section 3E1.1(b).  If the court felt it had
the discretion to do so, it would not only refuse the additional
point reduction to Gomez, but would also not give Fuentes or
Castro the benefit of the additional point under section
3E1.1(b).

VI.  Criminal History Category for Castro

Recognizing that "[r]epeated criminal behavior is an
indicator of a limited likelihood of successful rehabilitation,"
the Guidelines provide for the calculation of a defendant's
criminal history category that is then used to determine the
Guidelines range.  U.S.S.G. § 4A1.1 introductory cmt.  Castro's
PSR calculates his criminal history at category V based on the
fact that Castro was on parole at the time he committed the
instant offenses and has the following five adult convictions: 1)
1998 misdemeanor conviction for battery committed on June 29,
1998; 2) 2000 misdemeanor conviction for battery committed in
2000; 3) 2001 misdemeanor conviction for battery committed on
January 1, 2001; 4) 2004 felony conviction for assault with a
deadly weapon committed on May 13, 2002; and 5) 2002 misdemeanor

49

conviction for assault with a deadly weapon committed on
September 27, 2002.  (PSR ¶¶ 70-73, 76.)

Castro does not dispute that the probation officer
correctly treated all of his adult convictions as crimes of
violence and properly calculated his criminal history category
under section 4A1.1.  Castro contends, however, that the court
should depart downward from the resulting criminal history
category because all but one of his convictions were for
misdemeanors and two of his criminal history points resulted from
his status as a parolee at the time he committed the offenses
charged in this case.  Section 4A1.3(b) provides that a downward
departure from a criminal history category "may be warranted" if
"reliable information indicates that the defendant's criminal
history category substantially over-represents the seriousness of
the defendant's criminal history or the likelihood that the
defendant will commit other crimes."  The court does not find
that a downward departure is merited for Castro.

Although four of Castro's prior convictions were for
misdemeanors, the Guidelines necessarily take this factor into
consideration in assessing only one point for a prior sentence
less than sixty days and two points for a prior conviction of at
least sixty days but less than or equal to one year and one
month.  See U.S.S.G. § 4A1.1.  Castro thus received only one
point each for three of his misdemeanor convictions and two
points for his 2000 misdemeanor conviction because the sentence

for that offense was sixty days.[18] Castro's misdemeanor
convictions for violent conduct against his victims is precisely
the type of criminal behavior the Guidelines contemplate being
taken into account when determining a defendant's criminal
history category. See id. § 4A1.2(c) (providing that misdemeanor
offenses are counted, but then exempting certain non-violent
offenses); id. § 4A1.3 cmt. n.2(B). Castro's misdemeanor
convictions have thus resulted in a criminal history category of
V not because they "over-represent[] the seriousness of the
defendant's criminal history or the likelihood that the defendant
will commit other crimes," but because Castro committed four
violent misdemeanors in a relatively short duration of time.

Similarly, the Guidelines expressly provide for the
addition of two points if a defendant was on parole at the time
he committed the instant offense, which is based on "extant
empirical research assessing correlates of recidivism and
patterns of career criminal behavior." See U.S.S.G. § 4A1.1(d) &
introductory cmt. Here, Castro was on parole for a violent
felony after being sentenced to four years in prison at the time
he was serving as the regiment commander for San Francisco and
selling methamphetamine and cocaine. The addition of these two
points is consistent with the rationale that Castro's return to
criminal behavior while on parole suggests a greater chance of
recidivism and thereby justifies a higher criminal history

---

[18]    Even if the court departed downward by allocating only
one point to Castro's 2000 conviction because the sentence was
exactly sixty days and thus right on the cusp of receiving the
second point, Castro would still have a criminal history category
of V because he would have a total of ten criminal history
points.   See U.S.S.G. § 5, Pt. A (Sentencing Table).

category.

Overall, Castro's criminal history justifies a criminal history category of V because he has repeatedly committed violent offenses in close proximity to each other without any suggestion of an effort to become a law abiding citizen. Accordingly, because there is no "reliable information indicat[ing] that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," the court declines to depart downward from the calculation of Castro's criminal history at category V+

Neither Gomez nor Fuentes object to the calculation of the criminal history category in their PSRs.

For the foregoing reasons, the court hereby finds that the total offense levels and criminal history categories for the defendants are as follows:

The total offense level for **Fuentes is 33** (34 base offense level based on drug quantity; +2 for aggravating role enhancement; -3 for acceptance of responsbility), and his criminal history category is **III**.

The total offense level for **Castro is 35** (36 base offense level based on drug quantity; +2 for aggravating role enhancement; -3 for acceptance of responsbility), and his criminal history category is **V**.

The total offense level for **Gomez is 36** (36 base offense level based on drug quantity; +2 for aggravating role enhancement; -2 for acceptance of responsbility), and his criminal history category is **III**.

DATED:  May 1, 2012

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

53